UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID BLANDING,

                    Plaintiff,

          -against-

DANIEL F. MARTUSCELLO III,
Commissioner of the New York State
Department of Corrections and Community
Supervision; **CAROL MOORES**, Deputy
Commissioner and Chief Medical Officer;
**SUSANNA NAYSHULER**, Regional Health
Services Administrator; **MARK MILLER**,
Superintendent of Green Haven Correctional
Facility; **TARA JOAN,** Deputy Superintendent
of Health Services; **JOHN T. HAMMER**,
Facility Health Services Director of Green
Haven Correctional Facility; and **CHINYERE
OGHIDE**, Medical Provider at Green Haven
Correctional Facility;

                    Defendants.

---

Case No.: 1:26-cv-4999

**COMPLAINT**

"A prison that deprives prisoners of basic sustenance, including
adequate medical care, is incompatible with the concept of human
dignity and has no place in civilized society."

Justice Anthony Kennedy, *Brown v. Plata*, 563 U.S. 493, 510 (2011).

## PRELIMINARY STATEMENT

1.      Plaintiff David Blanding is a 61-year-old man currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Green Haven Correctional Facility. Mr. Blanding suffers from several serious health conditions, including, but not limited to, hypertension, rheumatoid arthritis, bilateral hearing loss, chronic kidney disease (stage III), extensive, recurrent, non-invasive, low-grade papillary epithelial carcinoma of the bladder (a form of bladder cancer), and, most recently, adenocarcinoma of the prostate (a form of prostate cancer).

2.      For over six years, Mr. Blanding has received only partial and deficient care for his bladder cancer, leading to repeated emergency surgical interventions to remove recurrent tumors in his bladder. He has never received a full chemotherapy regimen for this bladder cancer as ordered by his specialists, which, if administered as prescribed, likely could have prevented these recurrences. This inadequate care also risks the spread of cancer into Mr. Blanding's bladder lining, making metastatic disease more likely, and risks recurrent tumor growth that may block the drainage openings to the kidneys, which could lead to renal failure requiring lifelong dialysis.

3.      Mr. Blanding also has prostate cancer, which he learned about not from his providers at DOCCS, but from his legal advocates after they uncovered the diagnosis in a July 2024 pathology report, the results of which were never communicated to Mr. Blanding. It is not even clear that anyone at DOCCS was aware of this second diagnosis until the pathology report was obtained by counsel in April of 2025. Nevertheless, since the second cancer diagnosis was brought to the attention of Defendants over a year ago, Mr. Blanding

2

has not received the treatments prescribed by his specialists to treat his prostate cancer, which has progressed significantly during the pendency of Defendants' inaction. This diagnosis has gone from a highly curable stage to a stage that puts Mr. Blanding at significant risk of metastatic cancer and an extremely painful death.

4.      For years, Mr. Blanding has fought to obtain the care he needs to no avail. Dozens of letters, written grievances, phone calls, and emails have been sent by or on behalf of Mr. Blanding, noticing each of the Defendants to systemic issues delaying his care. Nevertheless, Defendants have exhibited a blatant disregard for the seriousness of Mr. Blanding's conditions and the urgency with which he requires treatment, evidencing their deliberate indifference to his medical needs in violation of the Eighth Amendment.

5.      Defendants' prolonged delay in facilitating Mr. Blanding's treatments within the timeframes set by his specialists continues to pose a significant and avoidable risk to Mr. Blanding's survival. Each of the Defendants named in this action are personally aware of Plaintiff's serious medical conditions and urgent medical needs, but have failed to adequately, accurately, or timely facilitate or administer the life-saving treatments.

6.       This suit seeks preliminary and permanent injunctive relief to enjoin Defendants—each of whom have some level of decision-making authority over Plaintiff's medical care and/or control over the coordination necessary to render that care, and who are personally aware of Mr. Blanding's medical needs—to require the prompt development of a written treatment plan in consultation with, and following the recommendations and prior orders given by Plaintiff's specialists at Westchester Medical Center, and to guarantee

that Defendants follow through in the timely execution and facilitation of that treatment for the duration of Mr. Blanding's time in DOCCS custody.

## JURISDICTION & VENUE

7.     Jurisdiction is proper pursuant to 28 U.S.C. § 1331, because Plaintiff brings federal constitutional claims pursuant to 42 U.S.C. § 1983.

8.     Venue is properly in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events alleged herein were committed within this district.

9.     Plaintiff's claim for injunctive relief is authorized by Federal Rule of Civil Procedure 65, 18 U.S.C. § 3626(a), and the Court's inherent equitable authority.

## PARTIES

10.     Plaintiff David Blanding ("Plaintiff" or "Mr. Blanding") is, and was, at all times relevant to this action, an incarcerated individual in the custody of the State of New York at Green Haven Correctional Facility.

11.     Defendant Commissioner DANIEL F. MARTUSCELLO III ("Martuscello") is the Commissioner of the New York State of New York Department of Corrections and Community Supervision ("DOCCS"). Commissioner Martuscello has authority over the operation of facilities within DOCCS, including directing those under his supervision to address the serious medical needs of those within DOCCS custody. He is personally aware of Mr. Blanding's medical conditions, deficient care, and the urgency with which he requires treatment. He is sued in his official capacity for acts and omissions committed under color of state law.

4

12.     Defendant DR. CAROL MOORES ("Dr. Moores") is a physician and the Deputy Commissioner and Chief Medical Officer of DOCCS. Dr. Moores is the highest-ranking medical professional within DOCCS charged with overseeing the Division of Health Services within DOCCS. She is personally aware of Mr. Blanding's medical conditions, deficient care, and the urgency with which he requires treatment. Dr. Moores is sued in her official capacity for acts and omissions committed under color of state law.

13.     Defendant SUSANNA NAYSHULER ("Nayshuler") is a Regional Health Services Administrator for DOCCS' Division of Health Services covering Green Haven Correctional Facility. Nayschuler is responsible for overseeing and coordinating the medical treatment of incarcerated persons within her region, including those housed at Green Haven. She is personally aware of Mr. Blanding's medical conditions, deficient care, and the urgency with which he requires treatment. Nayschuler is sued in her official capacity for acts and omissions committed under color of state law.

14.     Defendant MARK MILLER ("Superintendent Miller") is the Superintendent of Green Haven Correctional Facility, a DOCCS facility. Miller has authority over the daily operations of Green Haven, including ensuring that those within the facility are receiving adequate medical care and are being taken to the appropriate appointments to facilitate such care. Superintendent Miller is personally aware of Mr. Blanding's medical conditions, deficient care, and the urgency with which he requires treatment. Superintendent Miller is sued in his official capacity for acts and omissions committed under color of state law.

15.     Defendant TARA JOAN ("Joan") is Deputy Commissioner of Health Services ("DHS") for Green Haven Correctional Facility. She is responsible for overseeing prompt and

accurate provision of medical services to incarcerated people at Green Haven. Deputy Commissioner Joan is personally aware of Mr. Blanding's medical conditions, deficient care, and the urgency with which he requires treatment. She is sued in her official capacity for acts and omissions committed under color of state law.

16.     Defendant JOHN T. HAMMER ("Dr. Hammer") is a physician and the Facility Health Services Director of Green Haven Correctional Facility. He is the highest ranking medical professional overseeing the medical needs of those in custody at Green Haven Correctional Facility, including ensuring the timely execution of treatment for the incarcerated population. Dr. Hammer is personally aware of Mr. Blanding's medical conditions, deficient care, and the urgency with which he requires treatment. He is sued in his official capacity for acts and omissions committed under color of state law.

17.     Defendant CHINYERE OGHIDE ("Oghide") is a Nurse Practitioner and Plaintiff's primary medical provider at Green Haven Correctional Facility. Oghide is responsible for the day-to-day facilitation of medical care to Mr. Blanding, including implementing the recommendations of his specialists in consultation with the facility health director, Dr. Hammer. Oghide is personally aware of Mr. Blanding's medical conditions, deficient care, and the urgency with which he requires treatment. She is sued in her official capacity for acts and omissions committed under color of state law.

## FACTUAL ALLEGATIONS

18.     Plaintiff David Blanding ("Plaintiff" or "Mr. Blanding") is a 61-year-old man currently incarcerated in the New York State Department of Corrections and Community Supervision ("DOCCS") at Green Haven Correctional Facility ("Green Haven").

6

19.     Mr. Blanding suffers from multiple serious medical conditions, including, but not limited to: rheumatoid arthritis; bilateral hearing loss; chronic kidney disease (stage III); extensive, recurrent, non-invasive, low-grade papillary epithelial carcinoma of the bladder; and, most recently, adenocarcinoma of the prostate.

20.     Mr. Blanding needs numerous consultations, treatments, and procedures to effectively treat and manage these serious medical conditions, the most urgent of which is treatment for prostate cancer, which has reached an advanced stage, leaving Mr. Blanding at significantly increased risk of metastatic disease and premature death.

21.     Mr. Blanding also requires *complete* treatment for his bladder cancer, including chemotherapy, without which he has suffered multiple recurrences of tumors in his bladder, requiring repeated surgical intervention which, with proper treatment, may have otherwise been avoided. Absent proper treatment, the bladder cancer may invade the lining of the bladder and metastasize to other parts of the body. Moreover, tumor regrowth risks blockage of the drainage openings to his kidneys, risking renal failure.

22.     Despite clear directives from Mr. Blanding's specialists, Defendants, their predecessors, and those under their authority have abjectly failed to follow the sound medical advice of his specialists, putting Mr. Blanding's survival at imminent risk.

### *Mr. Blanding is Diagnosed with Bladder Cancer and Received Deficient Care for Years*

23.     Mr. Blanding first learned of his bladder carcinoma in late 2019 while incarcerated at Green Haven. In January 2020, he underwent his first resection of a large bladder tumor at Montefiore Mount Vernon Hospital ("Mt. Vernon"), under the care of his former urologist, Dr. Marc Janis ("Dr. Janis").

24.    When Mr. Blanding returned to Mt. Vernon for a follow-up visit in March 2020, Dr. Janis recommended six weekly bladder instillations of "BCG"— Bacillus Calmette-Guérin, an immunotherapy known to decrease the possibility of tumor recurrence—followed by repeat cystoscopy, a minimally invasive procedure that allows a physician to view the lining of the bladder and the urethra,[1] and assess the need for further treatment. A second urologist was consulted and agreed with this diagnosis and treatment plan.

25.    Notwithstanding these straightforward directives by two urologists, these recommendations were not followed by anyone in DOCCS, and Mr. Blanding did not receive either the BCG treatment to reduce the risk of tumor recurrence, or the follow-up cystoscopy necessary to assess the status of his bladder cancer.

26.    When Mr. Blanding was finally taken for another urology consultation *five months* later in August 2020, the urologist recommended that Mr. Blanding receive a cystoscopy *before* October 2020 to assess the status of his cancer. Once again, this care was not arranged, and no such procedures occurred within the recommended timeframe.

27.    In December 2021, nearly *two years* after his initial cancer diagnosis, Mr. Blanding was rushed to Mt. Vernon's emergency department after reporting severe abdominal pain and blood in his urine. A CT scan of Mr. Blanding's abdomen showed several areas of possible tumor recurrence, and it was recommended that he promptly follow up with urology.

28.    Despite the obvious urgent nature of this CT scan result, Green Haven did not take Mr. Blanding to see his urologist until *six months later* in June 2022, when he received

---

[1] *See generally* mayoclinic.org/tests-procedures/cystoscopy/about/pac-20393694.

another resection of a recurrent tumor in multiple sites in his bladder. Fortunately, the tumor had not invaded the underlying bladder muscle, but Mr. Blanding required close monitoring and follow-ups to ensure that any tumor regrowth did not invade the muscle.

29.   Pathology taken during the June 2022 procedure again confirmed non-invasive, low grade, papillary urothelial carcinoma. Dr. Janis noted that Mr. Blanding may require mitomycin, a chemotherapy drug, and documented the need for regular follow-up care.

30.   Upon information and belief, Mr. Blanding was only afforded tele-visits with Dr. Janis for the remainder of 2022, and was never given the chemotherapy drugs.

31.   After a clean cystoscopy in January 2023 (indicating there was no tumor regrowth), Mr. Blanding's medical team requested follow-up cystoscopies in July 2023 and November 2023. He never received this necessary follow-up care. Upon information and belief, there is no evidence that Mr. Blanding received *any* follow-up treatment or consultation with urology for the remainder of 2023.

32.   Without adequate monitoring and treatment, Mr. Blanding experienced yet another recurrence, necessitating another tumor resection in July 2024. Because a large amount of the tumor was surrounding an opening to a tube draining his kidney, Dr. Janis also placed a stent in to protect the area. Mr. Blanding was discharged with instructions to return within two weeks to go over his pathology report, begin mitomycin and continue it for six weeks, and to have the stent removed.

33.   By September 2024, no one at Green Haven had taken Mr. Blanding for his follow-up appointment as instructed, nor did he receive his chemotherapy regimen as prescribed. When Mr. Blanding began experiencing substantial pain and blood in his urine

again, Dr. Janis confirmed in a brief tele-health visit that these painful symptoms were likely caused by the delayed stent removal.

34.    When these concerning symptoms were brought to the attention of Defendant Dr. Moores in a September 17, 2024 letter, her response—one month later, after Mr. Blanding had missed yet another urology appointment—was that Mr. Blanding's medical care was "appropriate, timely, and closely monitored by the primary care provider."

35.    Contrary to this representation and confirmation from Dr. Janis that Mr. Blanding's ongoing suffering was caused entirely by DOCCS' failure to provide him with the necessary follow-up care, the Defendants didn't facilitate the surgical removal of the stent until December 2024—*more than four months after the recommended timeframe.* Luckily, Mr. Blanding did not develop a serious infection from this delayed removal, but it caused unnecessary pain and suffering while Mr. Blanding awaited treatment.

36.    Because no one at Green Haven took Mr. Blanding for his follow-up appointment two weeks after the July 2024 resection to review his pathology report, he had no idea if he still had bladder cancer or what, if any, subsequent care he required. He was aware, however, that he was meant to receive a chemotherapy drug that was never administered to him in DOCCS.

37.    For this reason, Mr. Blanding repeatedly asked his providers inside DOCCS about the chemotherapy that Dr. Janis prescribed, as well as the results of the July 2024 biopsy. But he was repeatedly told, in sum and substance, there was nothing on file indicating he needed further treatment, and that the results of the July 2024 pathology report were not in DOCCS' possession.

38. This confounding response rightly concerned Plaintiff, who knew that DOCCS has a responsibility to maintain his hospital records and discharge papers, and schedule follow-up appointments according to his specialist's instructions.

39. Because he remained in the dark as to the status of his own health, Mr. Blanding enlisted the assistance of his post-conviction advocates and attorneys at the Center for Appellate Litigation ("CAL"), who were able to obtain Mr. Blanding's medical records from both Green Haven and Mt. Vernon in the latter part of 2024.

40. Upon receipt, CAL shared the records with Dr. Barbara Ogur, an internist at Harvard Medical School, to render an opinion regarding the quality of care Mr. Blanding was receiving for purposes of applying for Compassionate Release, or "medical parole," pursuant to N.Y. Executive Law § 259-s.

41. In her December 3, 2024 declaration, Dr. Ogur concluded:

> The management of Mr. Blanding's bladder carcinoma has been seriously compromised during his incarceration. Major delays in recommended monitoring and the lack of provision of recommended treatments have resulted in repeated urgent admissions for regrowth of tumor and episodes of urinary obstruction which likely could have been prevented by the recommended monitoring and treatment.

*See* Ex. 1 at ¶6.

42. After this review by Dr. Ogur, it became clear that the results of the July 2024 pathology report were not part of the DOCCS medical records obtained by CAL, and Mr. Blanding remained in the dark about the status of his bladder cancer. Mr. Blanding's CAL advocates followed up to obtain the pathology report directly from Mt. Vernon, which was eventually produced to them in April 2025.

11

43.    Stunningly, CAL learned from this report that Mr. Blanding's July 2024 pathology not only revealed that the bladder cancer remained, but also showed a new cancer of the prostate, which no one in DOCCS ever communicated to Mr. Blanding at any time.

### Plaintiff is Diagnosed with Prostate Cancer but Does Not Receive Treatment

44.    Since the discovery of his prostate cancer, Plaintiff, his advocates at CAL, and counsel for this action repeatedly notified Defendants and Green Haven about this diagnosis and the need for urgent care.

45.    Nevertheless, Mr. Blanding remains without this necessary treatment *nearly two years* after the diagnosis was identified in the July 2024 pathology report.

46.    In early April 2025, Defendant Nayschuler was contacted by email and asked about any information for Mr. Blanding's upcoming appointments. Nayschuler responded that additional testing following the December 2024 stent removal "was not medically warranted." Of course, this was not true, because the July 2024 pathology report demonstrated that Mr. Blanding was suffering from both bladder and prostate cancer, and the prostate cancer had not yet been addressed in any way.

47.    In response, CAL informed Defendant Nayschuler that Mr. Blanding's pathology confirmed that, in addition to his bladder cancer, he had developed prostate adenocarcinoma and needed an immediate follow-up appointment with his urologist. On April 14, 2025, Defendant Nayschuler acknowledged and confirmed the prostate cancer diagnosis in writing, though, at that point, Mr. Blanding remained unaware of the diagnosis.

48.     On April 18, 2025, Mr. Blanding's CAL team visited him at Green Haven and shared the prostate diagnosis with him. This was the first time Mr. Blanding was informed that he had a second form of cancer in addition to the recurrent bladder cancer.

49.     After receiving the July 2024 pathology report, Dr. Ogur wrote a second letter as part of a renewed effort by CAL to help Mr. Blanding obtain medical parole. In her second follow-up report, dated April 27, 2025, Dr. Ogur expressed grave concern about these new developments, and the lack of care Mr. Blanding was receiving:

> The management of Mr. Blanding's bladder carcinoma has been seriously compromised during his incarceration and continues to be seriously compromised. Major delays in recommended monitoring and the lack of provision of recommended treatments have resulted in repeated urgent admissions for regrowth of tumor and episodes of urinary obstruction which likely could have been prevented by the recommended monitoring and treatment. *Nine months* after his surgery to remove the visible tumor in his bladder, at which time the recommendation was for him to have instillations of chemotherapy to prevent regrowth, he still has not been seen for these treatments.

*See* Ex. 2 at ¶6 (emphasis added).

50.     Dr. Ogur also expressed concern over Mr. Blanding's incomplete health record, which further risked unnecessary delay in facilitating necessary treatments:

> The pathology report from [Mr. Blanding's] July 2024 was not included in the initial reviewed records, nor in the records most recently provided by the DOCCS or Montefiore. His attorney had to directly call Montefiore and specifically request the report. This is significant for 2 reasons: First bladder cancer, if not managed carefully, can become more aggressive, invade more deeply, (necessitating removal of the bladder), or even become metastatic disease and life threatening. *The absence of the pathology report in the prison records and the absence of referral for ongoing treatment and surveillance of his cancer indicates that the prison health staff were not appropriately attending to his healthcare needs.*

*Id.* at ¶10 (emphasis added).

13

51.    Dr. Ogur went on to address DOCCS' failure to act on a new diagnosis:

> The second significant problem related to the failure to obtain [Mr. Blanding's] pathology report is that the report indicated a new finding: adenocarcinoma of the prostate . . . He should be evaluated by a urologist to determine if he should be treated with radiation, surgery, hormonal therapy, or followed actively to initiate treatment if the tumor becomes more aggressive.
>
> Not only does it appear that Mr. Blanding's healthcare team did not refer him, it appears they were unaware of the diagnosis of prostate cancer. In fact, Mr. Blanding himself was never informed of the diagnosis until his attorney's office deliberately sought the pathology report and told him. *This is clearly mismanagement.*

*Id.* at ¶¶11–12 (emphasis added).

52.    Dr. Ogur concluded that Mr. Blanding's lack of adequate medical care during his incarceration continues to threaten his survival:

> It is clear from repeat review of [Mr. Blanding's] healthcare records that he is not receiving appropriate care in prison and that the lapses of care have and continue to significantly threaten his survival. Indeed, failing to deliver recommended care for his bladder cancer, risking its potentially devastating or even lethal progression, is not simply malpractice, it is immoral.

*Id.* at 3.

53.    Dr. Ogur's reports were included in a packet prepared by CAL in support of Plaintiff's request for medical parole and were submitted to DOCCS' Division of Health Services, again putting Defendants on notice to Plaintiff's ongoing issues obtaining the medical care he requires.

54.    After additional advocacy by CAL and Mr. Blanding himself—including a May 2, 2025 letter to several DOCCS personnel, including Director of Nursing Services Barbara Taylor and Defendants Dr. Moores and Nayshuler—he was finally taken to a new provider at Westchester Medical Center ("Westchester Medical") for an intake appointment to

reassess his cancers in May of 2025. Upon information and belief, this appointment was only a consultation, and Mr. Blanding did not receive any care during this visit.

55.    In June 2025, Mr. Blanding was taken to a new urologist at Westchester Medical, Dr. Sean Fullerton, "for a second opinion due to delayed follow up." Dr. Fullerton, along with Mr. Blanding's cardiologist and oncologist at Westchester Medical, comprise the primary team of physicians currently treating Mr. Blanding's serious medical conditions.[2]

56.    After additional diagnostics were performed on Mr. Blanding in July 2025, a fourth resection of the recurrent bladder tumor was scheduled, during which Mr. Blanding was also supposed to receive a biopsy of his prostate cancer.

57.    Once again, the biopsy was delayed unnecessarily until September 2025—approximately *14 months* after the July 2024 pathology report revealed the second cancer.

58.    Despite this gratuitous, unexplained, and unacceptable delay, neither Defendants nor anyone at Green Haven communicated the results of Mr. Blanding's delayed biopsy; scheduled any follow-up appointments with his Westchester Medical Team; or otherwise facilitated necessary treatment for three additional months.

59.    By the time he was finally returned to Dr. Fullerton in December 2025, Mr. Blanding was informed that his prostate cancer had progressed to a Gleason score of 4+5 (grade group 5), the most severe classification, and that a PET scan was required to rule out metastatic disease. These results demonstrated that Mr. Blanding's prostate cancer advanced by three grade groups between July 2024 and December 2025, during which Mr. Blanding received absolutely no treatment for the aggressive prostate cancer.

---

[2] Together, these providers are referred to as the "Westchester Medical Team."

60.     CAL submitted another parole supplement with this information on December 11, 2025, which was sent to Defendants Dr. Moores and former Deputy Superintendent of Health ("DSH") Tuohy (whose position is now held by Defendant Joan), as well as Deputy Director of Nursing Services Barbara Taylor.

61.     On December 12, 2025, the Supervising Attorney of CAL's Conditions of Confinement unit, Bernadette Brown, contacted Defendant Martuscello by phone about the numerous issues delaying Mr. Blanding's care. Martuscello acknowledged these concerns.

62.     In January 2026, Mr. Blanding was prescribed chemotherapy and a hormone injection protocol by Dr. Fullerton. The doctor also recommended a resection of yet another recurrent bladder tumor. The surgery was completed that month, along with one round of chemotherapy, which was administered during the resection.

63.     During his January 2026 hospital admission, Mr. Blanding suffered a pulmonary embolism, and remained in the hospital for several days while it was treated. This essentially meant that he would also need to see his cardiologist before undergoing additional surgical treatments to ensure that the embolism did not affect his heart and did not pose any additional risks to his health. To date, Mr. Blanding has not received the follow-up testing and assessment his cardiologist recommended.

64.     Dr. Fullerton also informed Mr. Blanding that, before he could begin radiation treatments for his prostate cancer, he would need a "prostate fiducial marker placement procedure" to place markers to target the radiation treatment. To date, Mr. Blanding has not received this procedure.

65.    CAL sent an additional letter to Defendants Miller, Dr. Moores, and Martuscello, as well as former DHS Tuohy, detailing the status of Mr. Blanding's conditions and reporting several missed appointments: Green Haven staff had failed to transport Mr. Blanding to two appointments at Westchester Medical after the January hospital admission, including a cardiology appointment in February and an oncology appointment in March. Both appointments were cancelled because of Green Haven's failure to transport Mr. Blanding on time.

66.    In between these missed appointments, Mr. Blanding was rushed to the emergency department at Vassar Brothers Hospital after experiencing severe tightness and chest chain, and was admitted from March 8 to March 11, 2026 for treatment of pneumonia.

67.    In late April 2026, Mr. Blanding was called down to medical at Green Haven, where he received a blood draw and EKG, ostensibly in preparation for his next surgical treatment. Later the same day, Mr. Blanding was called to the medical unit a second time, where he spoke directly with his cardiologist from the Westchester Medical Team.

68.    The cardiologist expressed concern that Mr. Blanding had not yet been taken to the cardiologist for a follow-up after suffering a pulmonary embolism three months before, and recommended that he be admitted to the hospital so that his blood thinners could be safely tapered off, and he could receive a stress test prior to surgery.

69.    The cardiologist told Mr. Blanding that these were necessary steps before receiving surgery, and also recommended that Mr. Blanding receive a full evaluation from a rheumatologist to discuss how, if at all, the immunosuppressant medications Mr. Blanding has been taking for twenty years to treat his rheumatoid arthritis may interact with his

forthcoming cancer treatment, which will also suppress his immune system. Even though Mr. Blanding is supposed to be seen by a rheumatologist on a yearly basis, it has been approximately four years since his last visit, a fact that shocked his cardiologist.

70.    The same day, Mr. Blanding was taken to Westchester Medical's emergency room, where he expected to meet his cardiologist to receive the care they had just discussed at Green Haven. Instead, he remained shackled and cuffed for 14 hours, received rudimentary cardiac diagnostics that were not part of the recommended care, and was returned to Green Haven without seeing his cardiologist.

71.    On or about May 5, 2026, Mr. Blanding was transported back to Westchester Medical, where he was told that he would receive another cystoscopy and the prostate fiducial marker placement procedure to prepare him for radiation.

72.    However, once in a gown inside the pre-op room, a nurse inquired about Mr. Blanding's current medications, and he informed her that he was still taking blood thinners. The nurse immediately stated that the surgery would need to be cancelled and rescheduled, because Mr. Blanding could not undergo the procedures safely while on blood thinners.

73.    Plaintiff's urologist, Dr. Fullerton, came in and explained to Mr. Blanding that he specifically told DOCCS to safely discontinue the blood thinners prior to surgery, and that he had no idea why that directive was not followed. Once again, these issues were put in writing and sent to Defendants Miller and Joan, along with DOCCS general counsel.

74.    When Mr. Blanding was returned to Green Haven after the botched attempt to obtain necessary treatment, his DOCCS provider, Defendant Oghide, misrepresented to Mr.

18

Blanding that the surgery did not go forward because of an allergy that he has, in direct contradiction to the information provided by Dr. Fullerton.[3]

75.     Upon information and belief, this misinformation was an attempt to cover up the fact that Oghide failed to follow the specialist's pre-operative instructions, which may have caused serious complications, including death, had Mr. Blanding not told his Westchester Medical providers what medications he was taking moments before his surgery.

76.     On May 28, 2026, yet another written communication was sent to Defendants Martuscello, Miller, Joan, and Dr. Moores, with DOCCS counsel copied. The letter also served as another supplement to the request to grant Mr. Blanding medical parole, and updated several Defendants on the continued delays and issues with Mr. Blanding's care.

77.     However, as of the date of this filing, Mr. Blanding is still awaiting the care he needs, despite his deteriorating conditions and Defendants' actual knowledge of his serious diagnoses and direct orders from the Westchester Medical Team, which have not been followed. Each day that passes puts Mr. Blanding at further risk of irreparable harm to his health and life, as his cancers recur and grow in the face of Defendants' indifference.

## CAUSE OF ACTION

### 42 U.S.C. § 1983 Deliberate Indifference to Medical Needs in Violation of the Eighth Amendment

78.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

---

[3] Upon information and belief, Defendant Oghide is a nurse practitioner, but misrepresents herself to the incarcerated population as "Dr. Oghide." In Plaintiff's records, DOCCS refers to medical staff within the facility as his "providers." This typically references either Oghide—who is on site frequently and knows the details of Mr. Blanding's conditions and deficient care—as well as the current Facility Health Services Director of Green Haven, Dr. Hammer, who has never personally visited or evaluated Mr. Blanding, even though he is charged with overseeing his medical care.

79.     The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment, including deliberate indifference to an incarcerated persons' serious medical needs.

80.     Defendants' indifference includes, but is not limited to:

a.  failure to timely respond to or address recurrent pain and serious symptoms, such as blood and pain when urinating;

b.  failure to timely schedule appointments with the appropriate specialists, delaying each visit for months at a time, even when return to an outside provider was required within a specified timeline;

c.  failure to complete a timely transport of Mr. Blanding to scheduled appointments, causing their cancellation and further delay of treatment;

d.  failure to adhere to explicit instructions from Mr. Blanding's specialists, including his urologist, cardiologist, and/or oncologist, for follow-up treatment and diagnostics, including necessary pre- and post-operative preparation and follow-up;

e.  failure to administer prescription medications or treatments as directed, including life-saving chemotherapy drugs;

f.  failure to maintain an accurate and up-to-date medical file with all relevant history and diagnoses readily available to his providers to ensure he is receiving the consultations and treatments required; and

g.  failure to identify or address serious diagnoses, including a second form of cancer, which Mr. Blanding learned about through his attorneys, of which DOCCS seemed to be unaware until it was raised by counsel.

81.     Each of the Defendants have a critical role in the planning, scheduling, execution, and monitoring of Plaintiff's medical care, and are therefore the appropriate parties to enjoin, in their official capacities, to ensure Mr. Blanding receives the life-saving treatments he currently requires.

82.     Each of the Defendants are personally aware of Plaintiff's serious medical conditions, as well as the multitude of issues plaguing the execution of necessary treatment,

but have failed to timely or adequately address Mr. Blanding's serious medical needs—

indifference which continues to threaten his survival while in DOCCS custody.

## CONCLUSION

**WHEREFORE**, Plaintiff respectfully requests:

a. a preliminary injunction directing Defendants to immediately confer with Plaintiff's specialists at Westchester Medical Center to develop a written treatment plan, including what procedures are necessary to treat Mr. Blanding's bladder and prostate cancers and chronic kidney disease; what specific medical steps or consultations need to be taken in preparation for the safe administration of the prescribed treatment; and the time period in which these treatments must be completed to ensure Mr. Blanding's serious medical needs are appropriately addressed; as well as enjoining the execution of that plan during the pendency of this litigation;

b. a permanent injunction directing Defendants to follow, implement, and facilitate the prescribed treatment plan within the timeframes recommended by Plaintiff's specialists for the duration of his time in the custody of the New York Department of Corrections and Community Supervision;

c. a jury trial on all claims for which such relief is available;

d. an award of costs, interest, and attorney's fees; and

e. such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated:  New York, New York
       June 12, 2026

By:  _____
     Stephanie Panousieris
     Rickner Moskovitz LLP
     14 Wall Street, Suite 4C
     New York, New York 10005
     (212) 300-6506
     *Attorneys for Plaintiff*