UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X

**DAVID BLANDING**,

                               Plaintiff,

        - against -

**DANIEL F. MARTUSCELLO** III, Commissioner of the
New York State Department of Corrections and
Community Supervision; **CAROL MOORES,** Deputy
Commissioner and Chief Medical Officer; **SUSANNA
NAYSHULER,** Regional Health Services Administrator;
**MARK MILLER,** Superintendent of Green Haven
Correctional Facility; **TARA JOAN,** Deputy
Superintendent of Health Services; **JOHN T. HAMMER,**
Facility Health Services Director of Green Haven
Correctional Facility; and **CHINYERE OGHIDE,**
Medical Provider at Green Haven Correctional Facility,

                            Defendants.

------------------------------------------------------------------------ X

        26-CV-4999 (LAK) (KHP)

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*
28 Liberty Street
18th Floor
New York, NY 10005
(212) 416-8244

Daniel Kirschbaum
Assistant Attorney General
   *Of Counsel*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

PROCEDURAL HISTORY ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 2

LEGAL STANDARDS ................................................................................................................... 8

ARGUMENT ................................................................................................................................... 9

    PLAINTIFF IS NOT ENTITLED TO MANDATORY INJUNCTIVE RELIEF .................... 9

    I.    PLAINTIFF CANNOT DEMONSTRATE A CLEAR AND SUBSTANTIAL
        LIKELIHOOD OF SUCCESS ON THE MERITS ........................................................... 10

        A.  The Eleventh Amendment Precludes Plaintiff's Injunction Claim Against
            Defendants in Their Official Capacities ................................................................. 10

        B.  Plaintiff Fails to Demonstrate that Defendants Were a
            "Moving Force" Behind Any Alleged Constitutional Deprivation ....................... 12

        C.  Plaintiff Cannot Establish an Eighth Amendment Violation
            By These Defendants ............................................................................................. 13

    II.    PLAINTIFF CANNOT ESTABLISH IRREPARABLE HARM, BECAUSE DOCCS
        IS FURNISHING HIM WITH ADEQUATE MEDICAL TREATMENT ................. 16

    III.    PLAINTIFF FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES ......... 18

CONCLUSION .............................................................................................................................. 20

CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 7.1(c) ........................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................14

*Beatty v. Goord*,
   210 F. Supp. 2d 250 (S.D.N.Y. 2000)...............................................................18, 19

*Beeson v. Fishkill Corr. Facility*,
   28 F. Supp. 2d 884 (S.D.N.Y. 1998).......................................................................19

*Booth v. Churner*,
   532 U.S. 731 (2001)..............................................................................................18

*Bradshaw v. Marshal*,
   No. 21 Civ. 826, 2021 WL 5822538 (N.D.N.Y. Dec. 8, 2021) ................................16

*Bradshaw v. Phillip*,
   No. 21 Civ. 776, 2022 WL 504976 (N.D.N.Y. Feb. 18, 2022),
   appeal dismissed, 2022 WL 3703333 (2d Cir. Aug. 22, 2022) ................................16

*Cacchillo v. Insmed, Inc.*,
   638 F.3d 401 (2d Cir. 2011)....................................................................................10

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010).......................................................................................10

*Clark v. DiNapoli*,
   510 Fed. Appx. 49 (2d Cir. 2013).......................................................................11, 12

*Dunster v. Fed. Bureau of Prisons*,
   No. 10 Civ. 1735, 2011 WL 2360353 (E.D.N.Y. June 9, 2011) ..............................18

*Ex Parte Young*,
   209 U.S. 123 (1908)...........................................................................................10, 11

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110, 118 (2d Cir. 2009)............................................................................16

*Fisher v. Goord*,
   981 F. Supp. 140 (W.D.N.Y. 1997) .........................................................................16

*Francis v. Zavadill*,
   No. 06 Civ. 249, 2006 WL 3103324 (S.D.N.Y. Oct. 30, 2006) ....................... 19-20

*Goodspeed Airport, LLC v. E. Haddam Inland Wetlands and Watercourses Comm'n*,
    632 F. Supp. 2d 185 (D. Conn. 2009)................................................................12

*Green v. Garvin*,
    No. 04 Civ. 6781, 2008 WL 11516207 (S.D.N.Y. Aug. 21, 2008) ..........................15

*Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y.S. Dep't of Corr. & Cmty. Supervision*,
    16 F.4th 67 (2d Cir. 2021) ...................................................................................18

*Grullon v. City of New Haven*,
    720 F.3d 133 (2d Cir. 2013)...................................................................................14

*Hedrick v. Alfred*,
    No. 25 Civ. 0980, 2026 WL 1339980 (N.D.N.Y. May 14, 2026) ...........................10

*Kentucky v. Graham*,
    473 U.S. 159 (1985)................................................................................................12

*Khan v. U.S.*,
    271 F. Supp. 2d 409 (E.D.N.Y. 2003) ...................................................................15

*Knight v. N.Y.S. Dep't of Corrs.*,
    No. 18 Civ. 7172, 2020 WL 3893282 (S.D.N.Y. July 10, 2020) ...........................12

*Kravitz v. Annucci*,
    No. 16 Civ. 8999, 2019 WL 1429546 (S.D.N.Y. 2019) .........................................13

*Moore v. City of N.Y.*,
    No. 18 Civ. 496, 2019 WL 2616195 (S.D.N.Y. June 26, 2019)..............................15

*Moore v. Consol. Edison Co. of N.Y., Inc.*,
    409 F.3d 506 (2d Cir. 2005)......................................................................................9

*Morrison v. Parmele*,
    892 F. Supp. 2d 485 (W.D.N.Y. 2012),
    *aff'd sub nom. Morrison v. Stefaniak*, 523 Fed. Appx. 51 (2d Cir. 2013) ...............19

*Otoe-Missouria Tribe of Indians v. N.Y.S. Dep't of Fin. Servs.*,
    769 F.3d 105 (2d Cir. 2014)...................................................................................10

*Parris v. N.Y.S. Dep't Corr. Servs.*,
    947 F. Supp. 2d 354 (S.D.N.Y. 2013)....................................................................19

*Porter v. Nussle*,
    534 U.S. 516 (2002)................................................................................................19

iii

*Reynolds v. Giuliani*,
    506 F.3d 183, 191 (2d Cir. 2007)................................................................12, 13

*Richardson v. Goord*,
    347 F.3d 431, 435 (2d Cir. 2003)....................................................................14

*Rivera v. Pataki*,
    No. 01 Civ. 5179, 2003 WL 21511939 (S.D.N.Y. July 1, 2003) ...........................20

*Saba v. Cuomo*,
    535 F. Supp. 3d 282 (S.D.N.Y. 2021).............................................................10

*Smith v. Martuscello*,
    602 Fed. Appx. 550 (2d Cir. 2015)..................................................................12

*Tangreti v. Bachmann*,
    983 F.3d 609 (2d Cir. 2020)......................................................................14, 15

*Verzani v. Costco Wholesale Corp.*,
    387 Fed. Appx. 50 (2d Cir. 2010)....................................................................16

*Watson v. Wright*,
    2010 WL 2431068 (W.D.N.Y. 2010),
    *R&R adopted*, 2010 WL 2431071 (2010)...........................................................16

*Whitley v. Ort*,
    No. 17 Civ. 3652, 2018 WL 4684144 (S.D.N.Y. Sept. 28, 2018)...........................14

## Constitutions, Statutes, Rules

18 U.S.C. § 3626................................................................................................ 7-8

42 U.S.C. § 1983...........................................................................................11, 12

42 U.S.C. § 1997e(a)............................................................................................15

Fed. R. Civ. P.  4...................................................................................................1

7 N.Y.C.R.R. § 701.5...........................................................................................16

**PRELIMINARY STATEMENT**

Defendants Daniel F. Martuscello III, Carol Moores, Susanna Nayshuler, Mark Miller, Tara Joan, John T. Hammer, and Chinyere Oghide ("Defendants")[1] by their attorney, Letitia James, Attorney General of the State of New York, respectfully submit this memorandum of law in opposition to the motion for a preliminary injunctive relief filed by Plaintiff David Blanding ("Plaintiff").

Plaintiff's Complaint alleges deliberate indifference to his medical needs in violation of the Eighth Amendment. (*See* Dkt. No. 1.) He seeks a preliminary injunction, asking that the Court direct Defendants to: (1) immediately develop a written treatment plan in consultation with Plaintiff's specialists, including his "Westchester Medical Team"; (2) implement that plan during the pendency of this action; and (3) refrain from cancelling any pending or previously scheduled medical appointments for Plaintiff during the development of the Plan.  (*See* Dkt. Nos. 3-5.)

But Plaintiff cannot meet the heightened standard to establish entitlement to mandatory injunctive relief, particularly because his claims are unlikely to succeed on the merits. Plaintiff's official capacity injunction claim against Defendants is barred by the Eleventh Amendment. And Plaintiff fails to allege more than mere conclusory statements that Defendants were actually personally involved in any alleged constitutional violation. Finally, Plaintiff did not fully exhaust his administrative remedies as required prior to requesting injunctive relief.

**PROCEDURAL HISTORY**

Plaintiff filed his complaint on June 12, 2026. (Dkt. No. 1.) On that day, Plaintiff also filed a proposed Order to Show Cause ("OTSC," Dkt. No. 3) and moved for a preliminary injunction

---

[1]  As of this writing, Defendants have not been properly served with process in accordance with Federal Rule of Civil Procedure 4; instead, they have only been served by e-mail per the Court's Order To Show Cause (Dkt. No. 4). Defendants accordingly reserve all objections based on inadequate service of process.

(Dkt. No. 4), each requiring Defendants to "(a) Immediately consult with the appropriate specialists at Westchester Medical Center … to develop a written treatment plan for Plaintiff's serious medical needs (the "Plan") … ; [and] (b) Comply with the Plan for the pendency of this action"; and also asking that Defendants be "restrained, enjoined, and stayed from cancelling any pending or previously scheduled medical appointments for Plaintiff during the development of the Plan."  On June 16, 2026, the Court signed the OTSC, directing Defendants to file answering papers by June 22, 2026, and that the Parties appear on June 25, 2026 and show cause why Plaintiff's requested injunctive relief should not issue.  (Dkt. No. 11.)

## STATEMENT OF FACTS

### *Plaintiff's Allegations*[2]

Plaintiff is a 61-year-old man currently in New York State Department of Corrections and Community Supervision ("DOCCS") custody, at Green Haven Correctional Facility.  (Compl. ¶ 1.)  He suffers from hypertension, rheumatoid arthritis, bilateral hearing loss, chronic kidney disease (stage III), extensive, recurrent, non-invasive, low-grade papillary epithelial carcinoma of the bladder, and adenocarcinoma of the prostate.  (*Id*. ¶ 19.)

Plaintiff learned of his bladder carcinoma in late 2019 while at Green Haven, and the next month underwent his first resection of a large bladder tumor at Montefiore Mount Vernon Hospital ("Mt. Vernon"), under urologist Marc Janis ("Dr. Janis"). (*Id*. ¶ 23.) When Plaintiff returned to Mt. Vernon for a follow-up visit in March 2020, Dr. Janis and a second urologist recommended six weekly bladder instillations of "BCG" immunotherapy followed by repeat cystoscopy to view the bladder lining and the urethra, and assess the need for further treatment.  (*Id*. ¶ 24.)  Plaintiff alleges that he did not receive either the BCG treatment or the follow-up cystoscopy.  (*Id*. ¶ 25.)

---

[2] The plausible and non-conclusory factual allegations in Plaintiff's Complaint are accepted as true only for purposes of this motion. Defendants do not concede the truth of any of Plaintiff's allegations.

2

Plaintiff was taken for another urology consultation five months later in August 2020; the urologist recommended that Plaintiff receive a cystoscopy before October 2020 to assess the status of his cancer, but he alleges that this care was not arranged. (*Id*. ¶ 26.) In December 2021, after he reported severe abdominal pain and blood in his urine, Plaintiff was rushed to Mt. Vernon's emergency department; a CT scan of his abdomen showed several areas of possible tumor recurrence, and prompt follow-up with urologist was recommended. (*Id*. ¶ 27.) But Plaintiff alleges that he was not taken to see his urologist until six months later, in June 2022, when he received another resection of a recurrent tumor in multiple sites in his bladder. (*Id*. ¶ 28.) Pathology taken during this procedure confirmed non-invasive, low grade, papillary urothelial carcinoma. (*Id*. ¶ 29.) The tumor had not invaded the underlying bladder muscle, but Plaintiff contends that he "required close monitoring and follow-ups to ensure that any tumor regrowth did not invade the muscle." (*Id*. ¶ 28.) Dr. Janis also noted that Plaintiff "*may* require" chemotherapy drug, needed regular follow-up care. (*Id*. ¶ 29.)

Plaintiff complains that he was only afforded tele-visits with Dr. Janis for the remainder of 2022, and was not given the chemotherapy drugs. (*Id*. ¶ 30.) He concedes that he had a "clean" cystoscopy in January 2023, indicating no tumor regrowth, but complains that his medical team's requests for follow-up cystoscopies in July and November of that year were ignored or declined, and that he received no follow-up urology treatment that year. (*Id*. ¶ 31.) Plaintiff claims experienced another tumor recurrence necessitating resection in July 2024, during which Dr. Janis placed a stent in a tube draining his kidney, then discharged Plaintiff with instructions to return within two weeks to go over his pathology report, begin six weeks of chemotherapy, and have the stent removed. (*Id*. ¶ 32.) But as of September 2024, nobody had taken Plaintiff to his follow-up appointment, and he did not begin his chemotherapy; instead, Plaintiff began experiencing

"substantial pain" and blood in his urine, which Dr. Janis attributed (during a "tele-health visit") to the delayed removal of his stent. (*Id*. ¶ 33.) Plaintiff alleges that these symptoms were brought to Dr. Moores' attention in a September 17, 2024 letter, but her response a month later (after Plaintiff had missed another urology appointment) was that his medical care was "appropriate, timely, and closely monitored by the primary care provider." (*Id*. ¶ 34.) Surgical removal of the stent occurred in December 2024, over four months past the recommended timeframe, although Plaintiff concedes that he did not develop a serious infection from this delayed removal. (*Id*. ¶ 35.) Plaintiff claims that he repeatedly asked DOCCS health care providers about his prescribed chemotherapy and the results of his July 2024 biopsy, but was told that nothing in his files indicated the results of his biopsy, or that further treatment was needed. (*Id*. ¶¶ 36-37.)

Plaintiff's attorneys obtained his medical records from Green Haven and Mt. Vernon in late 2024, and his 2024 pathology report from Mt. Vernon in April 2025. (*Id*. ¶¶ 39-40.) The latter also indicated prostate cancer, of which Plaintiff had not been informed. (*Id*. ¶¶ 41-43.) Plaintiff claims that since then, his counsels have repeatedly notified Defendants about this diagnosis and the need to treat it, but that Plaintiff has not received the necessary treatment. (*Id*. ¶¶ 44-45.)

In early April 2025, when Defendant Nayschuler was e-mailed about upcoming appointments for Plaintiff and responded that additional testing following the December 2024 stent removal "was not medically warranted," which Plaintiff's counsel challenged in light of his 2024 pathology report indicating bladder and prostate cancer. (*Id*. ¶¶ 46-47.) On April 18, 2025, Plaintiff's counsel informed him of his prostate cancer. (*Id*. ¶ 48.) A consulting doctor retained by Plaintiff's counsel also wrote a letter assessing Plaintiff's new cancer developments, lack of recommended treatments, and incomplete health records – and concluding that Plaintiff's survival was at risk; the letter was included in a packet submitted to DOCCS' Division of Health Services

4

in support of Plaintiff's request for medical parole. (*Id*. ¶¶ 49-53.)

Plaintiff and his counsel then wrote several more letters to DOCCS personnel, including Defendants Moores and Nayshuler; after that, he was taken to a consultation at Westchester Medical Center in May 2025, and then met a new urologist there (Dr. Fullerton) that June. (*Id.* ¶¶ 54-55.) After additional tests in July 2025, a fourth bladder tumor resection was scheduled, during which Plaintiff would receive a biopsy of his prostate cancer – but the biopsy was delayed until September 2025. (*Id.* ¶¶ 56-57.) Plaintiff complains that the results of this delayed biopsy were never communicated to Plaintiff, nor were any follow-up appointments or treatments with his Westchester Medical Team facilitated for three more months. (*Id.* ¶ 58.) Plaintiff claims that by the time he returned to Dr. Fullerton in December 2025, his prostate cancer had progressed to a "Gleason score of 4+5 (grade group 5)," the most severe classification, and that a PET scan was required to rule out metastatic disease. (*Id.* ¶ 59.) Plaintiff's counsel submitted another parole supplement with this information on December 11, 2025 to Dr. Moores and Defendant Joan's predecessor. (*Id.* ¶ 60.) Plaintiff claims that during a December 12, 2025 telephone call with his counsel, Defendant Martuscello acknowledged their concerns over Plaintiff's delayed treatment. (*Id.* ¶ 61.)

In January 2026, Dr. Fullerton prescribed Plaintiff chemotherapy and a hormone injection protocol, plus resection of another recurrent bladder tumor; Plaintiff admits that the surgery and a round of chemotherapy were completed that month. (*Id.* ¶ 62.) However, while Plaintiff was in the hospital that month, he suffered a pulmonary embolism, and remained in the hospital for several days while it was treated. (*Id.* ¶ 63.) According to the Complaint, this meant that Plaintiff would need to see his cardiologist before undergoing additional cancer surgeries – but that he has not yet received the follow-up testing and assessment that his cardiologist recommended. (*Id.*)

5

Additionally, Dr. Fullerton informed Plaintiff that before beginning radiation treatments for his prostate, he needs a "prostate fiducial marker placement procedure" – but he has not yet received this procedure either.  (*Id.* ¶ 64.)

Plaintiff's counsel mailed Defendants Miller, Moores, Martuscello, and Joan's predecessor, a detailed report on his conditions, and the appointments he missed with cardiologists and oncologists at Westchester Medical Center in January, February, and March 2026 because Green Haven staff failed to transport him there in time. (*Id.* ¶ 65.) Plaintiff also notes that he was rushed to Vassar Brothers Hospital emergency room after experiencing severe tightness and chest chain, and admitted there from March 8 to March 11, 2026 with pneumonia.  (*Id.* ¶ 66.)

In late April 2026, Plaintiff was called to the Green Haven medical, where he with his Westchester Medical Team's cardiologist, who expressed concern that Plaintiff had not yet been taken to the cardiologist for a follow-up after his pulmonary embolism three months prior; the cardiologist also indicated that Plaintiff needed to be admitted to the hospital so that his blood thinners could be safely tapered off, and so he could receive a stress test, prior to surgery. (*Id.* ¶¶ 67-69.)   The cardiologist also recommended that a rheumatologist evaluate how the immunosuppressant medications that Plaintiff has taken for twenty years for his rheumatoid arthritis might interact with his upcoming cancer treatment, which also suppresses the immune system; the cardiologist expressed shock that Plaintiff, who is supposed to be seen annually by a rheumatologist, had not seen one for about four years.  (*Id.* ¶ 69.)  That day, Plaintiff was taken to Westchester Medical's emergency room, expecting to meet his cardiologist and receive the care they had just discussed; instead, he claims, he remained shackled and cuffed for 14 hours, received only rudimentary cardiac diagnostics not part of the recommended care, and then returned to Green Haven without seeing his cardiologist. (*Id.* ¶ 70.)

On about May 5, 2026, Plaintiff returned to Westchester Medical and was told that he would receive another cystoscopy and the prostate fiducial marker placement procedure to prepare him for radiation. (*Id.* ¶ 71.)  He claims, however, that in the pre-operation stage, a nurse inquired about Plaintiff's current medications and he mentioned that he was still on blood-thinner – at which point the surgery was cancelled because Plaintiff could not be operated on safely while on blood thinners.  (*Id.* ¶ 72.)  Urologist Dr. Fullerton explained to Plaintiff that he had instructed DOCCS to safely discontinue the blood thinners prior to surgery and had no idea why this was not done; Plaintiff asserts that "[o]nce again, these issues were put in writing and sent to Defendants Miller and Joan, along with DOCCS general counsel."  (*Id.* ¶ 73.)  Plaintiff claims that when he returned to Green Haven, Defendant Oghide misrepresented to Plaintiff that the surgery did not go forward because of "an allergy that he has" – which Plaintiff believes was an attempt to cover up Oghide's failure to follow Dr. Fullerton's pre-operative instructions, which could have caused serious or fatal complications had the hospital staff not inquired into Plaintiff's medication regimen.  (*Id.* ¶¶ 74-75.)

On May 28, 2026, Plaintiff's representatives again wrote Defendants Martuscello, Miller, Joan, and Moores, copying DOCCS counsel, to supplement their request for Plaintiff's medical parole, and update Defendants on the continued "delays and issues" with Mr. Plaintiff's care. (*Id.* ¶ 76.)   However, Plaintiff asserts that he is still awaiting the care he needs, "despite his deteriorating conditions and Defendants' actual knowledge of his serious diagnoses and direct orders from the Westchester Medical Team, which have not been followed."  (*Id.* ¶ 77.)

**Plaintiff's Treatment, According to His Medical Files**

A review of Plaintiff's medical files indicates that he was evaluated by his primary care provider, Defendant Nurse Practitioner Chinyree Oghide on February 9 and 11, and May 11, 2026;

7

and by Defendant Nurse Practitioner (and Acting Facility Health Service Director) Tara Joan on March 31, 2026. (*See* the accompanying Declaration of Danielle Feijoo-Snide, ¶ 4.) He was also seen by Nurse Practitioner Lorraine Rodriguez at emergency sick calls on December 29, 2025 (to discuss his plan of care for his upcoming appointments), and by Registered Nurse Shanielle Williams on March 9, 2026 following chest pain and shortness of breath – and then referred to Vassar Brothers Hospital by Defendant Oghide. (*Id.*) Nurse Rodriguez saw Plaintiff again on April 21, 2026 regarding his various medical referrals and scheduling. (*Id.*)

Plaintiff was also seen by an oncologist (Dr. Hurwitz) at Westchester Medical Center on February 26 and March 6, 2026. (*Id.* ¶ 5.) He was seen by a cardiologist (Dr. Tartaglia) at Westchester Medical Center on April 23, 2026, to clear him for his upcoming cystoscopy. (*Id.* ¶ 6.) However, because Plaintiff was complaining of chest pain and shortness of breath on that date, the cardiologist sent him to the hospital's emergency room, and scheduled him for a stress test on June 5, 2026. (*Id.*) The results of the stress test indicated that no cardiac contraindication to proceeding with a cystoscopy. (*Id.*)

In the meantime, Plaintiff had been scheduled for a cystoscopy on May 6, 2026 but it was cancelled – by his own urologist, Dr. Fullerton – when Dr. Fullerton realized that Plaintiff was allergic to gold, and that the fiducial markers contain gold compounds. (*Id.* ¶ 7.) Via e-mail sent to DOCCS personnel on June 9, 2026, Dr. Fullerton wrote: "We have found a product which does not have gold. He will be scheduled in a few weeks" for a make-up procedure. (*Id.*) Westchester Medical Center's Urology Department subsequently identified an alternative product and notified DOCCS' Central Office Scheduling staff that the cystoscopy would be rescheduled, with a tentative date during the third week of July 2026. Once the fiducial markers are placed, Plaintiff will follow up with Westchester Medical Center's Radiation Oncology department (Dr. Hurwitz),

8

to undergo Stereo-Tactic Radio Surgery ("SRS").  (*Id.* ¶ 8.)

Although Plaintiff alleges that he suffers from "chronic kidney disease" (Compl. ¶¶ 1, 19), his medical records reveal no documented diagnosis of such. A single laboratory result dated March 16, 2026 showed a decreased glomerular filtration rate ("GFR"); however, subsequent laboratory testing demonstrated normal renal function. (*Id.* ¶ 9.) Indeed, Plaintiff has had eight separate sets of blood tests done since April 2025, all of which demonstrated GFR within normal limits. (*Id.*)

Plaintiff's February 11, 2026 visit with NP Oghide included a hypertensive chronic care follow-up, and he is scheduled for another follow-up visit with her on June 23, 2026.  (*Id.* ¶ 10.) Plaintiff is scheduled to see rheumatologist Dr. Martin Morell via tele-med on June 26, 2026 for management of his rheumatoid arthritis. (*Id.* ¶ 11.)  Plaintiff cannot move forward with any significant cancer treatments in his bladder or prostate until the cystoscopy is completed so his fiducial markers can be placed.  (*Id.* ¶ 12.)  However, he continues to be able to see his providers at Green Haven Correctional Facility for routine care, such as at daily sick calls.

## ARGUMENT

### PLAINTIFF IS NOT ENTITLED TO MANDATORY INJUNCTIVE RELIEF[3]

Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).

In general, a district court may grant preliminary injunctive relief only where the plaintiff demonstrates "irreparable harm" and meets one of two related standards: "either (a) a likelihood

---

[3] In any event, and as Plaintiff acknowledges (Pltf. MOL, p.13, n.4), the PLRA limits preliminary injunctive relief to 90 days unless the court makes the findings required under 18 U.S.C. § 3626(a)(1) and makes the order final before the expiration of the 90-day period.  *See* 18 U.S.C. § 3626(a)(2).

of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Otoe-Missouria Tribe of Indians v. N.Y.S. Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (internal quotations omitted). However, when the movant seeks a "mandatory preliminary injunction that alters the status quo by commanding a positive act," the burden is "even higher." *Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 406 (2d Cir. 2011). Thus, a mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (internal quotation marks omitted); *see also Hedrick v. Alfred*, No. 25 Civ. 0980, 2026 WL 1339980, at *2 (N.D.N.Y. May 14, 2026).

### POINT I

### <u>PLAINTIFF CANNOT DEMONSTRATE A</u><br><u>CLEAR AND SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS</u>

Here, Plaintiff seeks a mandatory injunctive relief as they are seeking a positive act (Defendants creating and implementing a treatment plan), which requires that Plaintiff meet a "heightened standard." However, Plaintiff cannot demonstrate a clear and substantial likelihood of success on the merits of their official capacity deliberate indifference claims, because Plaintiff's claims are barred by the Eleventh Amendment.

**A.     The Eleventh Amendment Precludes Plaintiff's Injunction Claim<br>        Against Defendants in Their Official Capacities.**

"The Eleventh Amendment bars suits in federal courts against states and state officials acting in their official capacities by their own citizens, citizens of another state, and foreign sovereigns." *Saba v. Cuomo*, 535 F. Supp. 3d 282, 299 (S.D.N.Y. 2021). An exception exists, however, under *Ex Parte Young*, 209 U.S. 123 (1908): "a plaintiff may sue a state official acting

in his official capacity – notwithstanding the Eleventh Amendment – for prospective, injunctive relief from violations of federal law." *Saba*, 535 F. Supp. 3d at 299. Under this doctrine, "[a] plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, *provided that his complaint (a) alleges an ongoing violation of federal law* and (b) seeks relief properly characterized as prospective." *Clark v. DiNapoli*, 510 Fed. Appx. 49, 51 (2d Cir. 2013) (emphasis added).

In this case, Plaintiff does not allege an ongoing violation of federal law. Instead, Plaintiff's Complaint contains allegations of deliberate indifference concerning Plaintiff's treatment beginning in 2020: his non-receipt of BCG treatment after March 2020; the non-arrangement of his cystoscopy in mid-to-late 2020; the non-follow-up with a urologist between December 2021 and June 2022; the provision of only tele-visits with Dr. Janis in 2022 and non-provision of chemotherapy drugs; the ignoring of his requests for follow-up cystoscopies and urology treatment in July and November 2023; the four-month delay in taking Plaintiff to Dr. Janis to remove his kidney stent in 2024; the failure to provide Plaintiff prescribed chemotherapy or share the results of his July 2024 biopsy and the need to treat his prostate cancer; Dr. Nayshuler's conclusion that additional testing following the stent removal was not warranted; the delay in Plaintiff's prostate biopsy until September 2025, and in providing him follow-up appointments or treatments with his Westchester Medical Team for three more months; the lack of cardiologist-recommended testing after his embolism; the failure to schedule his "prostate fiducial marker placement procedure"; his missed appointments with cardiologists and oncologists at Westchester Medical Center in early 2026; his failure to see a rheumatologist for several years; his failure to see a cardiologist during his April 2026 Westchester Medical Center visit; and the failure to taper Plaintiff off blood-thinners ahead of his May 2026 cystoscopy and prostate fiducial marker procedure.

11

Plaintiff does not offer any evidence sufficient to show that any constitutional violation is actively ongoing to date; instead, he merely makes conclusory statements that he is "still awaiting the care he needs." (Compl. ¶ 77.) Plaintiff's Complaint demonstrates that much, if not most, of his treatment is dependent on specialists and providers from outside hospitals. This is plainly insufficient under the *Ex Parte Young* doctrine, which cannot be used "to adjudicate the legality of past conduct." *Clark*, 510 Fed. Appx. at 51; *see also Knight v. N.Y.S. Dep't of Corrs.*, No. 18 Civ. 7172, 2020 WL 3893282, at *8 (S.D.N.Y. July 10, 2020) (dismissing official capacity injunction claims against DOCCS official where plaintiffs' "alleged constitutional violations occurred in the past"); *Goodspeed Airport, LLC v. E. Haddam Inland Wetlands and Watercourses Comm'n*, 632 F. Supp. 2d 185, 188 (D. Conn. 2009) (exception to Eleventh Amendment immunity not satisfied absent evidence that "state officials *are actively violating federal law* or *imminently threatening acts* that the plaintiff challenges as unconstitutional") (emphasis added). Accordingly, Plaintiffs have no likelihood of success on their injunction claim against Defendants in their official capacity because it is precluded by the Eleventh Amendment.

**B.      Plaintiff Fails to Demonstrate that Defendants Were a "Moving Force" Behind Any Alleged Constitutional Deprivation.**

An official-capacity suit "is not a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Thus, "[a]n official capacity suit against a public servant is treated as one against the governmental entity itself," such that "a state official may be sued in his or her official capacity for injunctive or other prospective relief." *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007). Where, as here, an official capacity claim is alleged against a DOCCS official, a party "must allege a state policy or custom [that] played a part in the violation of federal law." *Smith v. Martuscello*, 602 Fed. Appx. 550, 551 (2d Cir. 2015) (internal citation and punctuation omitted).

12

To sustain a Section 1983 official capacity claim against an official of DOCCS, this court has concluded that a party must establish: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the [entity] caused the constitutional injury." *Kravitz v. Annucci*, No. 16 Civ. 8999, 2019 WL 1429546, at *9 (S.D.N.Y. 2019). However, an official capacity claim against a state official is viable only where there is evidence that "the state itself is the moving force behind the deprivation." *Reynolds* 506 F.3d at 191. In other words, "a plaintiff also must establish a causal link between the [entity's] policy, custom, or practice and the alleged constitutional injury. *Kravitz*, 2019 WL 1429546, at *9.

Plaintiff does not allege anywhere in the complaint that the Defendants had any policy or practice whatsoever – official or even unofficial – regarding Plaintiff's treatment (indeed, neither of those words appears anywhere in his Complaint or memorandum of law in support of this motion; therefore, none of the Defendants could be a moving force of a non-existent policy).  In the event Plaintiff attempts to allege that it is Defendants' custom to deny or delay treatment (another word that appears nowhere in his Complaint or memorandum of law), Plaintiff fails to correlate any Defendant's actions as a "moving force" behind his delayed treatment, and he also Plaintiff fails to establish any ongoing constitutional violation. *Reynolds*, 506 F.3d at 193.

As noted in the preceding section, Plaintiff's allegations rest entirely on *past* conduct. Plaintiff, however, offers no evidence to suggest that any policy or custom enforced by Defendants was the cause of this past conduct. Accordingly, Plaintiffs' official capacity claim fails for lack of causation.

**C.    Plaintiff Cannot Establish an Eighth Amendment Violation By These Defendants.**

Even were Plaintiff's Complaint read to plead claims against Defendants in their individual capacities, it would likewise fail to state a cognizable claim against them.

13

"To hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020). "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Whitley v. Ort*, No. 17 Civ. 3652, 2018 WL 4684144, at *5 (S.D.N.Y. Sept. 28, 2018) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)). To establish personal involvement, a plaintiff must show that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Id.* (quoting *Grullon*, 720 F.3d at 139). In other words, "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

In particular, "mere linkage in the prison chain of command is insufficient" to hold a defendant liable under a Section 1983 claim. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). Thus, a plaintiff cannot simply insist that each named defendant is responsible for everything that transpires within a prison facility, in light of the Second Circuit's holding that following *Ashcroft v. Iqbal*, 556 U.S. at 676, "courts may not apply a special rule for supervisory liability.  Rather, the plaintiff must directly plead and prove that 'each Government-official

14

defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti*, 983 F.3d at 612.  In Eighth Amendment deliberate indifference claims against prison supervisors, that means that a plaintiff must plead and prove that the supervisor had actual subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it.  *Id.* at 616.  And Plaintiff has pleaded nothing like that here; he fails to allege any facts showing that any Defendant had any personal involvement in the Eighth Amendment violations he alleges. Instead, Plaintiff broadly alleges only "deliberate indifference" in the form of bureaucratic ineptitude, which does not suffice to state a claim against any Defendant under Section 1983.

Nor can Plaintiff establish any Defendant's liability simply because his legal or medical team wrote angry letters to them.  Courts in this Circuit "have repeatedly held that as a matter of law, a defendant's mere receipt of a letter or grievance, without personally investigating or acting thereon, is insufficient to establish personal involvement."  *Moore v. City of N.Y.*, No. 18 Civ. 496, 2019 WL 2616195, at *6 (S.D.N.Y. June 26, 2019) (collecting cases; internal quotations omitted). *See also Khan v. U.S.*, 271 F. Supp. 2d 409, 413 (E.D.N.Y. 2003) ("Plaintiff has made only general claims that the supervisory defendants . . . 'failed to investigate' various 'claims and complaints' and that they 'failed to correct a condition which they were all made aware of was in existence.' Since plaintiff has made only very conclusory allegations . . . that are insufficient to show support personal involvement in any of the acts that form the basis of plaintiff's claims, the court dismisses the plaintiff's *Bivens* claims . . . ."); *and Green v. Garvin*, No. 04 Civ. 6781, 2008 WL 11516207, at *3 (S.D.N.Y. Aug. 21, 2008) ("the Complaint's only specific allegation about Garvin and Thomas is that they 'w[ere] aware at all relevant times of [P]laintiff's serious medical needs and w[ere] deliberately indifferent to them.'  Plaintiff did not allege any specific action or inaction by

15

Garvin or Thomas that constituted deliberate indifference.   Such conclusory allegations are insufficient to state a claim against Garvin or Thomas.").

Because Plaintiff does not plead facts to show that any Defendant was personally involved in an alleged constitutional violation, all of his claims are likely to fail – and he cannot establish a clear and substantial likelihood of success on his Eighth Amendment deliberate indifference claim.

**POINT II**

**PLAINTIFF CANNOT ESTABLISH IRREPARABLE HARM, BECAUSE DOCCS IS FURNISHING HIM WITH ADEQUATE MEDICAL TREATMENT**

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp*., 559 F.3d 110, 118 (2d Cir. 2009). Preliminary injunctions "are unavailable except in extraordinary circumstances" in the event "there is an adequate remedy at law, such as an award of money damages." *Verzani v. Costco Wholesale Corp.*, 387 Fed. Appx. 50, 51 (2d Cir. 2010). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Bradshaw v. Marshal*, No. 21 Civ. 826, 2021 WL 5822538, at *2 (N.D.N.Y. Dec. 8, 2021) (citing *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997)). "A finding of irreparable harm cannot be based solely on past conduct." *Bradshaw v. Phillip*, No. 21 Civ. 776, 2022 WL 504976, at *4 (N.D.N.Y. Feb. 18, 2022), appeal dismissed, 2022 WL 3703333 (2d Cir. Aug. 22, 2022). Past conduct is insufficient to give rise to a presumption of irreparable harm, "even where a plaintiff has alleged that such conduct violated the Eighth Amendment" by denying adequate medical care. *See, e.g., Watson v. Wright*, 2010 WL 2431068, at *2 (W.D.N.Y. 2010), *R&R adopted*, 2010 WL 2431071 (2010). Instead, a moving party must establish "imminent," and not "remote or speculative," harm that will befall it absent injunctive relief. *Bradshaw*, 2021 WL 5822538, at *3-4.

16

Here, Plaintiff fails to demonstrate imminent irreparable harm because as noted, his allegations of deliberate indifference are based on past conduct. And Plaintiff's complete medical records demonstrate that his care has hardly been neglectful as he paints it.  As indicated earlier, Plaintiff has seen primary care providers repeatedly this year (February 9 and 11, March 9 and 31, April 21, and May 11, 2026).  The February 11, 2026 visit included a hypertensive chronic care follow-up, and he is scheduled for another follow-up visit with her on June 23, 2026.

Plaintiff could not be cleared for his cystoscopy on April 23, 2026, because of chest pain and shortness of breath, so he was sent to the hospital's emergency room, and scheduled for a stress test on June 5, 2026.  The results of the stress test indicated that no cardiac contraindication to proceeding with a cystoscopy – but Plaintiff's own urologist cancelled the procedure because of Plaintiff's allergy to the gold components in the fiducial markers, and not (contrary to Plaintiff's assertion) because of blood thinners.  Plaintiff has since been rescheduled for the cystoscopy during the third week of July 2026, after which he will undergo Stereo-Tactic Radio Surgery ("SRS").  Plaintiff cannot move forward with any significant cancer treatments in his bladder or prostate until the cystoscopy is completed so his fiducial markers can be placed. Plaintiff is also scheduled to see a rheumatologist on June 26, 2026 for management of his arthritis.

Further, although Plaintiff alleges that he suffers from "chronic kidney disease" (Compl. ¶ 1), his medical records reveal no documented diagnosis of such. A single laboratory result dated March 16, 2026 showed a decreased glomerular filtration rate ("GFR"); however, subsequent laboratory testing demonstrated normal renal function. Indeed, Plaintiff has had eight separate sets of blood tests done since April 2025, all of which demonstrated GFR within normal limits.

In short, Plaintiff's allegedly inadequate care concerns past treatments that he claims not to have received. But his upcoming care is entirely unremarkable under the circumstances.

17

## POINT III

## PLAINTIFF FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES

In this case, the documents submitted by Plaintiff in support of his motion demonstrate that he has not fully exhausted the administrative grievance process regarding his claims. For this reason as well, he cannot succeed on the merits of his claims, and thus he also cannot prevail on a motion for preliminary injunctive relief.

The Prison Litigation Reform Act ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement applies to prisoners' suits "whether they are pursuing monetary or injunctive relief, even if the relief they seek is not available through the prison's grievance process." *Dunster v. Fed. Bureau of Prisons*, No. 10 Civ. 1735, 2011 WL 2360353, at *3 (E.D.N.Y. June 9, 2011) (citing *Booth v. Churner*, 532 U.S. 731 (2001)). Thus, under the PLRA, an incarcerated plaintiff must exhaust administrative remedies prior to seeking injunctive relief in a district court. *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 80 (2d Cir. 2021).

Claims concerning deliberate indifference to a plaintiff's medical needs constitute an action "with respect to prison conditions," governed by the PLRA. *Beatty v. Goord*, 210 F. Supp. 2d 250, 252 n.5 (S.D.N.Y. 2000). This Court has held that the PLRA exhaustion requirement applies to deliberate indifference claims, especially if the plaintiff requests for an injunctive remedy because an exhaustion requirement: (1) "'better serves the policy of granting an agency the opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal

18

court'"; 2) "'better avoids the possibility that frequent and deliberate flouting of [prison] administrative processes could weaken the effectiveness of [those prisons] by encouraging people to ignore [their] procedures'"; and 3) "'promotes judicial efficiency'"; and because even if no relief is granted, resort to the administrative process is not futile, but allows grievances to be heard and a record to be created for review in any subsequent proceeding.'" *Beatty*, 210 F. Supp. 2d at 254 (quoting *Beeson v. Fishkill Corr. Facility*, 28 F. Supp. 2d 884, 895 (S.D.N.Y. 1998) ("[t]he administrative process can serve to focus and clarify the issues for a court").

To satisfy the PLRA exhaustion requirement, an inmate in New York generally must follow DOCCS' three-step grievance procedure, set forth at 7 N.Y.C.R.R. § 701.5: (1) submission of a grievance within twenty-one days of the objectionable occurrence, to the Inmate Grievance Program supervisor – who then forward it to the Inmate Grievance Resolution Committee ("IGRC"), which has sixteen days to resolve it informally or to conduct a hearing; (2) within seven days after receiving an unsatisfactory IGRC determination, appeal to the facility superintendent, who then has twenty days to render a decision; (3) within seven days after receiving an unsatisfactory superintendent decision, appeal to the Central Office Review Committee ("CORC"). "All three steps of this grievance procedure must ordinarily be exhausted before an inmate may commence suit in federal court." *Morrison v. Parmele*, 892 F. Supp. 2d 485, 488 (W.D.N.Y. 2012) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)), *aff'd sub nom. Morrison v. Stefaniak*, 523 Fed. Appx. 51 (2d Cir. 2013)

Thus, "[a]n inmate has not exhausted his administrative remedies until he receives a final decision from CORC regarding his grievance." *Parris v. N.Y.S. Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 361 (S.D.N.Y. 2013). "Only upon such a final determination by CORC is an inmate deemed to have exhausted his administrative remedies." *Francis v. Zavadill*, No. 06 Civ. 249,

19

2006 WL 3103324, at *3 (S.D.N.Y. Oct. 30, 2006).  And critically, there is no "'urgent medical relief' exception to the PLRA's exhaustion requirement." *Rivera v. Pataki*, No. 01 Civ. 5179, 2003 WL 21511939, at *6 (S.D.N.Y. July 1, 2003)

Here, Plaintiff has failed to exhaust his administrative remedies.  Per Exhibit 10 to the Declaration of Stephanie Panousieris (Dkt. No. 6-10), Plaintiff filed a grievance regarding his "Appointments Cancelled or Delayed" in early December 2025, and then had it submitted to CORC on March 16, 2026. (*See id.*, at pp. 1-2, 4-7.)  But there is no indication that CORC fully reviewed and adjudicated the grievance.  Similarly, per Panousieris Declaration Exhibit 11 (Dkt. No. 6-11), on February 6, 2026, Plaintiff filed a grievance titled "have not seen provider for follow-up after taken to WMC on 1/12/26," and then had that submitted to CORC as well, on April 16, 2026. (*See id.*, pp. 1-7.)  But again, there is no indication in the record that CORC has fully adjudicated the latter grievance.  As such, Plaintiff has not yet fully exhausted his required administrative remedies, and this entire action is premature.

## CONCLUSION

Based on all of the foregoing, this Court should deny Plaintiff's motion for preliminary injunctive relief in its entirety.

Dated: New York, New York
        June 22, 2026

                                        Respectfully submitted,

LETITA JAMES
Attorney General
State of New York

*Attorney for Defendants*

By: */s/ Daniel Kirschbaum*
Daniel Kirschbaum
Assistant Attorney General
28 Liberty Street, 18th Floor
New York, New York 10005
(212) 416-8244
Daniel.Kirschbaum@ag.ny.gov

21

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 7.1(c)

According to the word count function of Microsoft Word, the foregoing document contains

<span style="background-color: yellow">      </span> words, not including its caption, tables of contents and authorities, signature blocks, or

this certification.

Dated: June 22, 2026
      New York, New York

Respectfully submitted,

LETITIA JAMES
Attorney General
State of New York

*Attorney for Defendants*

By: _/s/ Daniel S. Kirschbaum_____
      Daniel S. Kirschbaum
      Assistant Attorney General
      28 Liberty Street, 18th Floor
      New York, New York 10005
      (212) 416-8244
      Daniel.Kirschbaum@ag.ny.gov