USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: __________
DATE FILED: 07/23/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DAVID BLANDING,

Plaintiff,

-against-

26-cv-4999 (LAK)

DANIEL F. MARTUSCELLO III, Commissioner of the New York State Department of Corrections and Community Supervision, *et al.*,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION GRANTING PRELIMINARY INJUNCTION**

Appearances:

Stephanie Panousieris
Joshua S. Moskovitz
Sara J. Wolkensdorfer
RICKNER MOSKOVITZ LLP
*Attorneys for Plaintiff*

Daniel Kirschbaum
Assistant Attorney General
LETITIA JAMES
ATTORNEY GENERAL, STATE OF NEW YORK
*Attorney for Defendant*

LEWIS A. KAPLAN, *District Judge.*

Plaintiff David Blanding is a 61-year old inmate at Green Haven Correctional Facility, a penal institution run by the New York State Department of Corrections and Community Supervision ("DOCCS"). He is also a very sick man. He suffers from both bladder and prostate cancer. The suffering has been aggravated and his life placed at greater risk through the deliberate indifference to his serious medical needs by the defendants at Green Haven and DOCCS.

The law does not demand that prisoners serving criminal sentences receive the same quality and accessability of medical care often available to well insured or financially capable individuals who are at liberty in the community. But it does demand that prisoners' serious medical needs be met by those who control their fate. And the reason is plain:

> "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death."[1]

Accordingly,

> "when the state takes a person into custody, severely limiting his ability to care for himself, and then is deliberately indifferent to his medical needs, the Eighth Amendment's proscription against the unnecessary and wanton infliction of pain is violated."[2]

The trial record in this case demonstrates that the defendants and other DOCCS personnel largely and in many cases deliberately have failed to provide Blanding with the urgently needed and potential life-saving care to which he constitutionally is entitled. Their record of deliberate indifference to Blanding's serious medical needs in this case is inexcusable. It is well to provide a brief summary of some of their failures before turning to the multitude of details.

Blanding was diagnosed some years ago with bladder cancer. He received the surgery necessary to remove all visible tumor. But the urologist who did so prescribed an immunotherapy treatment to avoid the cancer's recurrence. DOCCS never gave it to Blanding. Further, doctors recommended also that Blanding undergo repeat cystoscopies to check for new

---

1 *Estelle v.Gamble*, 429 U.S. 97, 103 (1976) (cleaned up).

2 *Charles v. Orange County*, 925 F.3d 73, 85 (2d Cir. 2019).

tumors. DOCCS did not do so. The next year, after Blanding began urinating blood, a CT scan revealed that the bladder cancer had returned.

Things only got worse from there. In July 2024, Blanding underwent another surgery to remove new tumors from his bladder. During the surgery, doctors placed a stent in the opening of a tube draining his kidney – with instructions for Blanding to have it removed in six weeks. But the stent was not removed in six weeks, quickly causing Blanding to begin experiencing severe pain. His lawyers pleaded with prison officials to schedule the stent's removal, but still months passed with no action. By the time the stent was removed in December, Blanding had endured months of unnecessary agony. And that was not the only problem. After the surgery, Blanding's urologist prescribed a six-week course of chemotherapy. But DOCCS never provided that chemotherapy either.

Still other egregious behavior found its roots in the July 2024 bladder operation. During that event, the doctors took a tissue sample for testing. The pathology report showed that Blanding had prostate (in addition to bladder) cancer. But neither DOCCS nor anyone else told Blanding. And the prison personnel and DOCCS did *nothing* to address Blanding's prostate cancer for nearly a year. In time, Blanding's lawyers uncovered the pathology report containing the prostate cancer diagnosis while prosecuting an application for medical parole. It was his lawyers who informed Blanding that he had prostate cancer, not the DOCCS personnel who were responsible for his medical care. Defendants provided no explanation for their failure, and only two possibilities come to mind. Either (1) they elected not to bother viewing the pathology report on one of their inmate patients in the wake of that patient's cancer surgery and thus were deliberately ignorant of the new prostate cancer diagnosis, or (2) they read the report, but elected neither to inform Blanding of its content nor to take any action whatever to treat the prostate cancer. And the consequences for

Blanding have been very serious indeed. His prostate cancer worsened significantly during the many months in which the state neither informed him of this new illness nor did anything at all to treat this new and dangerous condition.

This appalling and deliberate indifference to the physical health of a man committed to defendants' custody was ongoing when Blanding filed his complaint in June. At that time, he was awaiting a procedure that would allow him to start radiation treatment for his prostate cancer, radiation that had been prescribed months earlier. In fact, Blanding had been brought to the hospital and prepped for the procedure in early May (already months behind schedule). But the procedure abruptly was cancelled after his medical providers learned that the prison had failed to take him off blood thinners,[3] contrary to his doctor's explicit instructions.

For years, Blanding's lawyers raised concerns about his care with prison officials up and down the chain of command, including with the DOCCS's commissioner. Blanding filed multiple grievances. Yet little, to nothing, changed. Having exhausted his administrative remedies, Blanding sought emergency relief from this Court. That relief was granted in the form of a preliminary injunction requiring prison officials to develop and follow a comprehensive plan for treating Blanding's life-threatening medical conditions. This opinion explains why the granting of that relief was necessary and proper and contains the Court's findings of fact and conclusions of law.

---

[3] Blood thinners are drugs that inhibit the clotting of blood used for various medical reasons. *Anticoagulants*, CLEVELAND CLINIC (Jan. 10, 2022), https://my.clevelandclinic.org/health/treatments/22288-anticoagulants. They frequently are discontinued in advance of surgery to avoid unnecessary and potentially dangerous bleeding during the procedures.

## Facts

This action is brought by Blanding against several Green Haven and DOCCS officials in their official capacities for injunctive relief under 42 U.S.C. § 1983. The complaint alleges sundry violations of the Eighth Amendment's prohibition on cruel and unusual punishment.[4] It should be noted at the outset that the defendants submitted testimony of only one witness, an individual with little or no personal knowledge of evidentiary facts who did not even claim any medical education or qualifications.[5]

### *I. Blanding's Cancer Care From 2019 to Present*

#### *A. Blanding Diagnosed with Bladder Cancer*

Blanding was diagnosed with bladder cancer in 2019.[6] In January 2020, he underwent a transurethral resection of his bladder at Montefiore Mount Vernon Hospital ("Mt. Vernon"), during which all visible tumor was removed and after which a pathology report indicated that the cancer had not spread to the muscle of the bladder – both good signs.[7] In March 2020, Blanding's urologist at Mt. Vernon, Dr. Marc Janis, prescribed a six-week course of an intravesical immunotherapy treatment called Bacillus Calmette-Guérin, or BCG, to decrease the possibility of

---

4 Defendants are Daniel F. Martuscello III, commissioner of DOCCS; Carol Moores, deputy commissioner and chief medical officer of DOCCS; Susanna Nayschuler, a regional health services administer at DOCCS; Mark Miller, superintendent of Green Haven; Tara Joan, deputy superintendent of health services at Green Haven; John T. Hammer, facility health services director at Green Haven; and Chinyere Oghide, a medical provider at Green Haven.

5 Feijóo-Snide Decl. (Dkt 16).

6 Blanding Decl. (Dkt 6-1) ¶ 2; Goldstein Decl. (Dkt 6-2) ¶ 3.

7 Goldstein Decl. ¶ 3; First Ogur Decl. (Dkt 6-3) ¶ 9.

the cancer recurring.[8] Dr. Janis recommend also that Blanding undergo a cystoscopy following the administration of the BCG, to assess the need for further treatment.[9] A second urologist concurred in Dr. Janis's treatment plan.[10]

The BCG never was administered.[11] Nor did Blanding timely receive another cystoscopy to check if his cancer had returned. In August 2020, his providers recommended a cystoscopy before October 2020.[12] That was not done.[13] At his next urologist appointment one year later, in August 2021, a cystoscopy again was recommended.[14] That too was not done.[15]

In the months following the January 2020 procedure, Blanding repeatedly asked his providers at Green Haven why he was not being given the further treatment that had been ordered

---

8 Goldstein Decl. ¶ 4; First Ogur Decl. ¶ 9. Blanding describes the care that Dr. Janis prescribed as a form of chemotherapy. Blanding Decl. ¶ 2. In a declaration, a lay advocate of Blanding's similarly asserts that Dr. Janis prescribed "intravesical chemotherapy with BCG . . . for six weeks." Goldstein Decl. ¶ 4. But a doctor recruited by Blanding's legal team did not describe BCG as a form of chemotherapy in the statement she wrote to prison officials in December 2024 (and she did not indicate that he had been prescribed anything other than the BCG). First Ogur Decl. ¶ 9. The Court need not dwell on the precise definition of chemotherapy, or resolve whether Blanding was prescribed BCG *and* chemotherapy or just BCG. Defendants have not disputed that in 2020 Blanding was prescribed a drug to treat his bladder cancer that simply was never given to him.

9 Goldstein Decl. ¶ 4; First Ogur Decl. ¶ 9.

10 Goldstein Decl. ¶ 5.

11 Blanding Decl. ¶ 2; Goldstein Decl. ¶ 6.

12 First Ogur Decl. ¶ 9.

13 *Id.*

14 *Id.* ¶ 10.

15 *Id.*

by his doctor.[16] He was ignored or told that he was getting all the care he needed.[17] He claims also to have filed a written grievance in 2021 that was denied on the ground that he was receiving adequate care,[18] a claim that the Court credits in consequence of the defendants' failure to dispute it.

Despite the fact that Blanding repeatedly was told by prison officials that he was receiving all the necessary care, before this Court the defendants (1) have not disputed that the BCG was prescribed and (2) have offered no medical justification, reasonable or otherwise, for failing to provide it to Blanding.

### *B. Blanding's Bladder Cancer Recurs*

In December 2021, Blanding was taken to an emergency room with abdominal pain and bloody urine.[19] During that visit, a CT scan indicated tumor growth in his bladder.[20] For reasons unexplained by the record, however, Blanding did not have surgery to remove those tumors until June 2022, when he underwent his second transurethral resection of the bladder.[21]

---

16 Blanding Decl. ¶ 3.

17 *Id.*

18 *Id.* ¶ 4.

19 Goldstien Decl. ¶ 7; First Ogur Decl. ¶ 10.

20 Goldstein Decl. ¶ 7; First Ogur Decl. ¶ 10.

21 Goldstein Decl. ¶ 7; First Ogur Decl. ¶ 11.

The second surgery, like the first, went well, and a January 2023 cystoscopy came back clean.[22] But again Blanding apparently did not receive the follow-up care he needed. Cystoscopies were requested in July and November of 2023, but nothing in Blanding's medical records indicates that one was performed, nor are there any notes of urology consultations.[23]

*C. Blanding's Bladder Cancer Recurs Again*

In July 2024, Blanding presented with blood in his urine yet again.[24] That month he underwent a third transurethral resection of his bladder.[25] During the procedure, a stent was placed to reinforce one of the tubes draining his kidney, around which there had been significant tumor growth, and a specimen was collected for pathology.[26]

*D. Prison Officials Fail to Follow Doctor's Instructions After July 2024 Surgery*

Following the July 2024 procedure, Dr. Janis recommended that Blanding (1) return to Mt. Vernon in two weeks to review the pathology report, (2) begin a six-week course of mitomycin (a chemotherapy drug), and (3) have the stent removed in six weeks.[27] Blanding was not

---

22 First Ogur Decl. ¶ 11.

23 First Ogur Decl. ¶ 11.

24 Goldstein Decl. ¶ 9.

25 *Id.*

26 Goldstein Decl. ¶ 9; First Ogur Decl. ¶ 12.

27 Goldstein Decl. ¶ 10.

brought to Mt. Vernon to review his pathology report within two weeks, was not given mitomycin as prescribed, and did not have his stent removed until ***five months*** later.[28]

The stent's delayed removal quickly began causing Blanding significant pain and, in September 2024, he again presented with blood in his urine.[29] Between September and November of that year, Blanding's advocates at the Center for Appellate Litigation ("CAL") repeatedly reached out to prison officials, including Defendants Susanna Nayschuler and Carol Moores, in an effort secure the stent's removal. On September 10, CAL left a message with a staff member of the DOCCS health services department in Albany.[30] A few days later, Nayschuler, the regional health services administrator, called back and said the stent-removal appointment had to be scheduled by the hospital.[31] On September 17, CAL emailed Moores, the chief medical officer of DOCCS, informing her that Blanding was in severe pain and needed his stent removed urgently.[32] Moores did not respond.[33]

On September 25, CAL contacted Blanding's provider and secured an appointment for him on October 8.[34] The next day, CAL emailed Nayschuler to confirm that Blanding would

---

[28] *Id.* ¶ 11.

[29] *Id.* ¶ 12.

[30] *Id.* ¶ 13.

[31] *Id.*

[32] *Id.* ¶ 14.

[33] *Id.*

[34] *Id.* ¶ 15.

be taken to the October 8 appointment, but she replied to say only that Green Haven's security was responsible for transporting inmates to and from appointments.[35] Green Haven, however, refused to confirm to CAL whether Blanding would transported to the hospital on October 8.[36] CAL made further, similar inquires on Blanding's behalf, both in writing and by phone, on October 2, 3, 7 and 8.[37] On the day of the appointment, CAL was told by a Green Haven nurse: "If you keep calling, it is unlikely that he will get to the appointment."[38]

Blanding was not taken to the October 8 appointment.[39] The stent was not removed until December 26, 2024,[40] by which time Blanding had endured months of unnecessary pain.

---

35 *Id.*

36 *Id.* On October 3, Nayschuler informed CAL that "dates for scheduled and/or rescheduled appointments for incarcerated individuals' are not subject to disclosure." *Id.* ¶ 16. It is, of course, standard practice not to inform inmates of the upcoming dates on which they will be taken outside their prison facility for security reasons, including to avoid escape. CAL responded to Nayschuler's email of October 3 to request that Nayschuler's office contact Green Haven about the October 8 appointment. *Id.* ¶ 17.

37 *Id.* ¶¶ 16-19.

38 *Id.* ¶ 20.

Although Blanding has not made such a claim, the Court notes that some aspects of the record raise a question as to whether Blanding was retaliated against by prison officials for advocating for his own care.

39 *Id.* ¶ 21.

40 *Id.* ¶ 25.

*E. Blanding Diagnosed with Prostate Cancer But No One Tells Him*

In late 2024, CAL recruited Dr. Barbara Ogur, an associate professor of medicine at Harvard Medical School and a longtime practitioner of internal medicine, to provide a declaration in support of a request for medical parole.[41] In reviewing Blanding's medical records, Dr. Ogur noticed that the records contained no pathology report from the specimen taken from Blanding in July 2024.[42] CAL obtained that report in April 2025.[43] It indicated that Blanding had prostate cancer (and still had bladder cancer).[44] These results – again, from July 2024 – never had been shared with Blanding.[45] Nor had anything been done to treat the prostate cancer, which then was classified as being at intermediate risk of metasticizing, a so-called "Gleason" severity grade of 2 out of 5.[46]

CAL promptly followed up with Defendant Nayschuler to ask what upcoming treatment or testing was scheduled for Blanding.[47] In response, Nayschuler said that Blanding was scheduled for a follow-up urology appointment but that additional testing was "not medically

---

41 *Id.* ¶¶ 26-27; First Ogur Decl. ¶ 1.

42 Goldstein Decl. ¶ 30.

43 *Id.* ¶ 31.

44 *Id.*

45 *Id.* ¶ 32.

46 *Id.* ¶ 31; *see also* Dkt 6-4 at 5; Plaintiff's Exhibit 3 at 5.

47 Goldstein Decl. ¶ 33.

warranted."[48] After CAL pressed for more information about the treatment of Blanding's prostate cancer specifically, Nayschuler said (on April 14) that Blanding's new medical provider had confirmed the prostate and bladder cancer diagnoses – but provided no plan for evaluation, monitoring, or treatment of those diseases.[49] On April 18, Blanding was told about his prostate cancer diagnosis, for the first time, *by his attorneys* at CAL.[50]

### *F. Blanding's Prostate Cancer Prognosis Worsens After Delayed Treatment*

In May 2025, Green Haven finally arranged for Blanding to be seen by a new urologist at Westchester Medical Center, Dr. Sean Fullerton.[51] The referral was documented in Blanding's records as being "for a second opinion due to delayed follow up."[52]

In September 2025, Blanding underwent a cystoscopy that included a biopsy of his prostate.[53] The biopsy results were dated September 23 yet were not shared with Blanding until December.[54] They showed that Blanding's prostate cancer had worsened to a 5 out of 5 on the

---

48 *Id.*

49 *Id.* at ¶¶ 34-35.

50 Goldstein Decl. ¶ 36; Blanding Decl. ¶ 7.

51 Goldstein Decl. ¶ 40.

52 *Id.*

53 *Id.* ¶ 41; Dkt 6-8 at 3.

54 Goldstein Decl. ¶ 42; Blanding Decl. ¶ 9; Dkt 6-9.

Gleason scale, meaning it was at high risk of spreading.[55] (Recall that Blanding's prostate cancer was considered only at intermediate risk of spreading when it was first discovered in July 2024.) Dr. Fullerton recommended a PET scan to rule out the possibility of metastatic cancer.[56]

*G. Blanding Undergoes Another Bladder Resection, Suffers Pulmonary Embolism*

In January 2026, Blanding underwent another transurethral resection of his bladder.[57] While at the hospital, Blanding began complaining of chest pain.[58] A CT scan revealed that he was suffering from a pulmonary embolism, so he was put on blood thinners.[59]

Also in January, Blanding was prescribed chemotherapy, a hormone injection protocol, and (for his prostate cancer) a round of radiation therapy.[60] Blanding's oncologist then told him that he needed to undergo a fiducial marker placement procedure[61] before starting radiation and

---

[55] Goldstein Decl. ¶ 42; Dkt 6-9.

[56] Goldstein Decl. ¶ 42; Blanding Decl. ¶ 9.

[57] Goldstein Decl. ¶ 47; Blanding Decl. ¶ 17.

[58] Goldstein Decl. ¶ 47; Blanding Decl. ¶ 18.

[59] Goldstein Decl. ¶ 47; Blanding Decl. ¶ 18.

[60] Goldstein Decl. ¶ 46; Blanding Decl. ¶¶ 17, 19, 21.

[61] The procedure involves the surgical placement of markers to facilitate proper targeting of radiation to the prostate. *See generally* Angela G.M. O'Neill, et al., *Fiducial Marker Guided Prostate Radiotherapy: A Review*, BRITISH J. RADIOLOGY, December 2016, at 20160296, https://pmc.ncbi.nlm.nih.gov/articles/PMC5604907.

that the procedure should be scheduled within the next month.[62] Although it appears that Blanding received at least some of the recommended chemotherapy and hormone treatments,[63] he did not timely undergo the marker placement procedure that was a necessary prerequisite to commencing radiation therapy.

### *H. Blanding Caused to Miss Appointments, Await Urgently Needed Procedures*

Blanding was scheduled to see his providers at Westchester Medical on February 26. But Green Haven was so late in driving him there that the appointment was cancelled.[64] Blanding was supposed to see his cardiologist on March 13. Green Haven, again, was so late in getting him there that the appointment was cancelled.[65]

On April 23, Blanding was still waiting to undergo the fiducial marker placement procedure that would allow him to begin radiation treatment. He was brought to the medical unit at Green Haven multiples times that day.[66] While there, he met with his cardiologist, who expressed concern that Blanding had not received necessary follow-up care after his pulmonary embolism.[67] The cardiologist said that Blanding needed a stress test and needed to be tapered off blood thinners

---

62 Goldstein Decl. ¶ 46; Blanding Decl. ¶ 21.

63 Goldstein Decl. ¶ 47; Blanding Decl. ¶¶ 17, 20.

64 Goldstein Decl. ¶ 49; Blanding Decl. ¶ 24.

65 Goldstein Decl. ¶ 51; Blanding Decl. ¶ 25.

66 Blanding Decl. ¶ 28.

67 Goldstein Decl. ¶ 62; Blanding Decl. ¶ 28.

before undergoing surgery.[68] He recommended also that Blanding consult with his rheumatologist to discuss how, if at all, the immunosuppressant medications Blanding had been taking for 20 years would interact with his cancer treatments.[69]

The cardiologist's recommendations were not followed.[70] After the doctor left, Defendant Chinyere Oghide, a nurse practitioner at Green Haven, told Blanding that he was being taken to the emergency room for chest pains.[71] Blanding tried to explain that his conversation with the cardiologist had not been about chest pains.[72] He then was taken to the emergency room at Westchester Medical, where he spent 14 hours cuffed and shackled while undergoing tests for urgent cardiac issues.[73] He later returned to Green Haven without seeing his cardiologist or receiving any of the care his doctor had recommended.[74]

---

68 Goldstein Decl. ¶ 62; Blanding Decl. ¶ 28; *see also* Plaintiff's Exhibit 1.

69 Goldstein Decl. ¶ 63.

70 Goldstein Decl. ¶ 65; Blanding Decl. ¶ 29.

71 Blanding Decl. ¶ 29.

72 *Id.*

73 *Id.*

74 *Id.*; Goldstein Decl. ¶ 65.

*I. Procedures Cancelled After Prison Fails to Follow Doctor's Orders*

In early May, Blanding was brought to Westchester Medical for the fiducial placement marker procedure as well as a cystoscopy.[75] But the surgery abruptly was cancelled after Blanding mentioned to a nurse that he was still on blood thinners.[76] Dr. Fullerton came to Blanding and explained that the hospital could not perform the procedures because Green Haven had failed to follow his instructions to take him off blood thinners.[77]

* * *

Such was the state of affairs when Blanding filed this action on June 12, 2026. At that time, he was still awaiting the fiducial marker placement procedure that would allow him to start radiation treatment, as well as another cystoscopy.[78] Yet there was no indication to Blanding or his attorneys that any of those procedures and consultations had been scheduled or rescheduled,[79]

---

75 Goldstein Decl. ¶ 66; Blanding Decl. ¶ 30.

76 Goldstein Decl. ¶ 67; Blanding Decl. ¶ 30.

77 Goldstein Decl. ¶ 68; Blanding Decl. ¶ 31. Defendants assert that Blanding's May procedures were canceled because of a gold allergy. Feijóo-Snide Decl. ¶ 7. But this contradicts Blanding's testimony, which the Court credits. Furthermore, Dr. Fullerton's written report on that day made no mention of a gold allergy. Plaintiff's Exhibit 2. The report did, however, note that Blanding "did not stop [his blood thinner] for procedure today." *Id.*; *see also* Plaintiff's Exhibit 1 (cardiologist's report from April 23 recommending that Blanding stop taking blood thinner); Plaintiff's Exhibit 4 (DOCCS medical form directing that Blanding stop taking blood thinners starting April 28 until after cystoscopy). Defendants' assertion that a gold allergy played some role in delaying his surgery is too cursory and lacking in documentary support for the Court to give it any weight on the current record.

78 Blanding Decl. ¶ 32.

79 Goldstein Decl. ¶ 74.

despite (as discussed in more detail below) the persistent pleas of Blanding and his attorneys that Blanding receive prompt care. And Blanding was still on blood thinners at least as of June 4.[80]

### *J. CT Scans Confirms New Tumor Growth in Bladder*

On June 15, the Monday after this lawsuit was filed, Blanding was taken to Vassar Brothers Hospital after experiencing blood in his urine.[81] A CT scan indicated the presence of multiple tumors in his bladder requiring urgent surgical intervention.[82] He then was returned to Green Haven.[83] CAL reached out to Nayshuler, who said that she was "familiar" with Blanding's case but needed "to look at the specifics on his condition" before she could speak further about next steps.[84] She stated also that she would be traveling and unable to respond until June 22.[85] As of June 16, Blanding was still experiencing blood in his urine.[86]

---

[80] Blanding Decl. ¶ 32.

[81] Supp. Goldstein Decl. (Dkt 15-1) ¶¶ 3, 7.

[82] *Id.* ¶ 7.

[83] *Id.*

[84] *Id.* ¶¶ 9-12.

[85] *Id.* ¶ 12.

[86] *Id.* ¶ 13.

## *II. Prison Officials Ignore Complaints for Years*

### *A. Outreach by Law Firms Representing Blanding*

Blanding's attorneys repeatedly have brought Blanding's substandard care to the attention of prison officials, including many of the defendants. For example, as discussed above, CAL attempted for months to get the prison to schedule Blanding's stent removal, to no avail, and subsequently questioned the prison as to why it had not been treating his prostate cancer.

The following is an account of additional communications that defendants received related to Blanding's serious medical needs, from both CAL and Blanding's cousel of record before this Court, Rickner Moskovitz LLP.

#### *1. December 2024*

On December 17, 2024, CAL emailed an application for medical parole to Defendant Daniel F. Martuscello III, the commissioner of DOCCS, and Defendant Carol Moores, the deputy commissioner and chief medical officer of DOCCS.[87] The application included a declaration from Dr. Ogur that outlined deficiencies in Blanding's care to date.[88] Dr. Ogur there said that Blanding's care "ha[d] been seriously compromised during his incarceration."[89] She explained that "[m]ajor delays" in recommended monitoring and treatments "ha[d] resulted in repeated urgent admissions

---

[87] Goldstein Decl. ¶ 26.

[88] *Id.*

[89] First Ogur Decl. ¶ 6.

for regrowth of tumor and episodes of urinary obstruction which likely could have been prevented by the recommended monitoring and treatment."[90]

Dr. Ogur said that Blanding needed "careful, regular speciality follow-up and treatment" to avoid serious complications, including the possible removal of his bladder (should his bladder cancer become invasive) or death (should it spread to other organs).[91] Dr. Ogur recommended also the continued monitoring of Blanding's prostate in light of troublesome lab results that sometimes are indicative of prostate cancer.[92] (Blanding's July 2024 pathology report already indicated that he had prostate cancer, but Dr. Ogur, like Blanding himself, was unaware of that fact at the time of her writing.) Finally, Dr. Ogur noted that Blanding needed care for chronic kidney disease, which can be life-threatening.[93]

*2. May 2025*

In early May 2025, after uncovering Blanding's prostate cancer diagnosis, CAL wrote to several prison officials, including Defendants Moores, Nayshuler, and Mark Stillman, the

---

[90] *Id.*

[91] *Id.* at 3.

[92] *Id.*

[93] *Id.*

Defendants dispute that Blanding has "chronic kidney disease." Feijóo-Snide Decl. ¶ 9. But it is clear from Dr. Ogur's reports that Blanding's cancers threaten the health of his kidneys, First Ogur Decl. ¶¶ 7, 13; Second Ogur Decl. ¶¶ 7, 13, and it is undisputed that Blanding has had abnormal kidney labs at least once in the past, Feijóo-Snide Decl. ¶ 9. On the current record, Blanding has demonstrated that a comprehensive plan to address his medical needs should include consideration of what monitoring and treatment, if any, is necessary to protect the health of his kidneys.

superintendent of Green Haven.[94] The letter alerted them to the prostate cancer diagnosis and urged them to ensure that Blanding urgently received adequate care.[95]

A few days later, CAL submitted an amended application for medical parole,[96] which included an updated declaration from Dr. Ogur, who recounted the events since her December 2024 letter and concluded:

> "It is clear from repeat review of his healthcare records that he is not receiving appropriate care in prison and that the lapses of care have and continue to significantly threaten his survival. Indeed, failing to deliver recommended care for his bladder cancer, risking its potentially devastating or even lethal progression, is not simply malpractice, it is immoral."[97]

Also in early May, CAL sent updated medical records to Defendant Stillman documenting that Dr. Janis had prescribed chemotherapy for Blanding's bladder cancer.[98]

*3. October and November 2025*

As explained above, Blanding underwent a biopsy in September 2025 to evaluate the progression of his prostate cancer. Yet the results of that biopsy were not shared with Blanding until December 2025. During the intervening months, Rickner Moskovitz LLP attorney Stephanie Panousieris contacted Defendant Nayschuler repeatedly to inquire about Blanding's care.

---

[94] Goldstein Decl. ¶ 37.

[95] *Id.*

[96] *Id.* ¶ 38.

[97] Second Ogur Decl. (Dkt 6-4) at 3.

[98] Goldstein Decl. ¶ 39.

On October 9, Panousieris left a detailed message with a DOCCS health services employee in Albany, who told her that the information would be forwarded to Defendant Nayschuler.[99] On October 15, Panousieris emailed Nayschuler directly to express grave concern about Blanding's care, including the failure to timely and adequately following the instructions of Blanding's urologist.[100] The reply was an automated "away" message.[101]

Panousieris followed up with Nayschuler by email on November 4 to share a HIPAA authorization from Blanding and to request an update on the status of the follow-up appointment with Dr. Fullerton.[102] Nayschuler responded the next day, asking what appointments Panousieris had been referring to in her October 15 email.[103] Panousieris again explained the numerous issues that Blanding was having with his care, including the fact that he regularly had been using the sick call procedures at his facility in an attempt to obtain information about his care only to be told repeatedly that he had no appointments scheduled and that there was no information to share about

---

99 Panousieris Decl. (Dkt 6) ¶ 19(a).

100 *Id.* ¶ 19(b).

101 *Id.*

102 *Id.* ¶ 19(c).

103 *Id.*

the biopsy that had been taken on September 22.[104] Panousieris received no response, so she followed up on November 18.[105] Nayschuler again did not respond.[106]

#### 4. *December 2025*

After Blanding finally had been taken for his follow-up appointment in December, Panousieris emailed Nayschuler to inform her that Dr. Fullerton had told Blanding that he needed prompt surgical intervention, chemotherapy, and further testing.[107] In response, Nayschuler said that she needed a HIPAA authorization to discuss Blanding's care.[108] Panousieris immediately forwarded the authorization she had sent on November 4.[109] Nayschuler responded, in part, to say that Blanding's medical care was "regularly overseen by his primary care provider."[110] Panousieris then called one of Dr. Fullerton's offices, which confirmed that no follow-ups had been scheduled and that no attempts to schedule any such follow-ups had been made by the prison.[111]

---

104 *Id.*

105 *Id.* ¶ 18(d).

106 *Id.*

107 *Id.* ¶ 19(e).

108 *Id.* ¶ 19(f).

109 *Id.*

110 *Id.*

111 *Id.* ¶ 19(g).

On December 10 and 11, 2025, CAL submitted another amendment to his medical parole application via email to Defendant Moores and other officials, including Defendant Tara Joan's predecessor as deputy superintendent of health services at Green Haven.[112] The supplement explained that the delay in treating Blanding had caused his condition to worsen.[113]

On December 12, a CAL attorney spoke with Defendant Martuscello by phone concerning the numerous issues delaying Blanding's care and he acknowledged those concerns.[114]

*5. January 2026*

On January 27, 2026, CAL sent another letter to Defendant Moores and the then-deputy superintendent of health services at Green Haven.[115] The letter alerted those officials to the pulmonary embolism that Blanding recently had suffered and requested that he be scheduled for the fiducial marker placement procedure as soon as possible.[116]

112 Goldstein Decl. ¶ 44.

113 *Id.*

114 *Id.* ¶ 45.

115 *Id.* ¶ 48.

116 *Id.*

*6. March and April 2026*

After Green Haven failed to timely transport Blanding to his February and March 2026 appointments, causing them to be canceled, CAL engaged in another round of outreach to prison officials.

On March 26, a CAL attorney contacted Defendant Martuscello by phone, and he acknowledged receipt of her message.[117] The following week, on April 2, CAL submitted another supplemental letter in support of Blanding's medical parole request to Defendants Martuscello, Moores, and Miller.[118] The letter recounted the two missed appointments and the pulmonary embolism, and requested the urgent scheduling of the necessary treatments for his bladder and prostate cancers. Miller responded to say that the email had been received.[119] Later that month, CAL again called Martuscello to relay concerns, and he again acknowledged receipt.[120]

On April 10, Panousieris sent a detailed letter to Defendants Martuscello, Moores, and Miller, and to Defendant Joan's predecessor as deputy superintendent of health services at Green Haven.[121] Among other things, the letter recounted:

- the prison's failure to facilitate the administration of "chemotherapy" that had been prescribed to treat Blanding's bladder cancer following his first

117 *Id.* ¶ 53.

118 *Id.* ¶ 54.

119 *Id.* ¶ 56.

120 *Id.* ¶ 60.

121 Panousieris Decl. ¶ 22.

surgery in January 2020 (an apparent reference to the BCG immunotherapy[122]), including Blanding's repeated, futile attempts to raise this issue with prison officials;

- CAL's persistent outreach to Nayschuler, starting in 2024 and continuing into 2025, concerning Blanding's deficeint care, worsening symptoms, and missed appointments;
- the circumstances surrounding CAL's discovery of Blanding's prostate cancer diagnosis, including that no medical professional at DOCCS had shared this diagnosis with him;
- the January 2026 recommendation that Blanding receive radiation treatment, including that Blanding was still awaiting that treatment.[123]

Panousieris received no response.[124]

*7. May and June 2026*

The latest round of outreach prior to the filing of the complaint occurred in May and June, following the last-minute cancellation of the cystoscopy and radiation-marker procedures.

CAL alerted Defendants Miller and Joan, as well as DOCCS's general counsel, to the cancellation of Blanding's procedures by email on May 6.[125] The same day, an advocate from

---

122 *See supra* note 8.

123 Dkt 6-12 at 1-3.

124 Panousieris Decl. ¶ 20.

125 Goldstein Decl. ¶ 69.

CAL called the DOCCS health services department in Albany in an attempt to get Blanding's procedures rescheduled and was told that her message would be shared with Defendant Nayschuler, who did not follow up.[126]

On May 28, CAL emailed yet another supplement to Blanding's medical parole application, to Defendants Martuscello, Miller, and Joan, and to the DOCCS general counsel.[127] On June 2, CAL again called the health services department in Albany to see about the rescheduling of Blanding's procedures – and again was told the information would be shared with Defendant Nayshuler.[128]

*B. Grievances*

In addition to numerous informal conversations with prison staff, Blanding submitted at least two relevant written grievances in the months leading up to the filing of the complaint. Under the applicable state regulations, inmate grievances undergo up to three levels of review.[129] The grievance is considered first by an inmate grievance resolution committee ("IGRC") consisting of inmates and staff at the inmate's facility, then if necessary by the facility superintendent, and finally if necessary by the central office review committee ("CORC"), which acts under the

126 *Id.* ¶ 70.

127 *Id.* ¶ 71.

128 *Id.* ¶ 72.

129 *See generally* 7 N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5.

authority of the commissioner of DOCCS.[130] The CORC is required to render a decision "within 30 calendar days from the time the appeal was received."[131]

### *1. November 2025 Grievance*

On November 15, 2025, Blanding submitted a written grievance to the IGRC requesting that he "be afforded adequate & humane medical treatment ASAP."[132] Blanding wrote:

> "For approx. 7 yrs. I have been trying to get help/treatment for chronic/life threatening illnesses. My appointments with specialists are constantly delayed or canceled. My provider(s) cannot/will not answer my questions. Sick call nurses have informed me that 'There is nothing they can do[,]' except refer me to my provider (10-17-25 approx.)."[133]

On January 4, 2026, a grievance program supervisor informed Blanding that the deadline for the IGRC to take action had passed without any action having been taken.[134] The next item in the record is a letter by Blanding, dated February 18, in which he claims that the grievance had been appealed to the superintendent (Defendant Miller) on or about January 12 but that the

---

130 *Id.* §§ 701.1(c), 701.5(b)-(d).

131 *Id.* § 701.5(d)(3)(ii).

132 Dkt 6-10 at 2 (capitalization altered).

133 *Id.* (capitalization altered).

134 *Id.* at 3.

superintendent had not taken any action since that time.[135] Blanding accordingly requested that the grievance be forwarded to CORC.[136]

On March 6, Miller responded to the grievance by stating: "Grievant has requested that GH 1527-25 be passed to the Superintendent as the IGRC is over the 16-day time frame to have a hearing. Grievance is accepted to the extent stated above."[137] On March 12, Blanding appealed Miller's response to CORC, with a note asserting that Miller's March 6 response "further substantiate[d] the fact that [Green Haven] is unable/unwilling to respond to serious matters in a timely fashion."[138] He added: "Note: Trip to Westchester Medical on 2-26-26 canceled[.] Left [Green Haven] @ 3:30 PM??"[139]

On March 16, the grievance program supervisor informed Blanding that the grievance had been mailed to CORC that day.[140] Nothing in the record indicates that CORC has responded.

---

135 *Id.* at 4.

136 *Id.*

137 *Id.* at 5.

138 *Id.* (capitalization altered).

139 *Id.* (capitalization altered).

140 *Id.* at 7.

*2. February 2026 Grievance*

On February 2, 2026, Blanding submitted another written grievance to the IGRC.[141] Blanding again complained about systemic issues in his medical care, writing:

> "On or about 1-12-26 I was taken & admitted to Westchester Medical Hospital for approx. 10 days. Since my return I have not been seen by my provider & given the opportunity to discuss my issues & have questions answer[ed.] This seems to be a longstanding pattern with NYS DOCCS and Green Haven CF. As a result & over the years, my medical issues have got progressively worse despite my many attempts at informal resolutions. It is now effecting my metal health as I feel that I've been deliberately given a death sentence."[142]

He requested that he "be afforded proper & timely medical care immediately" and that medical staff "be instructed to answer any & all questions" regarding his medical care.[143] He sought $20 million, too, "for pain, suffering & years of mental anguish due to deliberate indifference."[144]

On February 13, the IGRC recommended that Blanding be seen by his provider, noting that Blanding had concerns that he had not been able to relate to his provider.[145] The committee stated that it had no authority to award money damages. The same day, Blanding filed a notice that he agreed with the IGRC but wished also to appeal to the superintendent.[146]

---

141 Dkt 6-11 at 2.

142 *Id.* (capitalization altered).

143 *Id.* (capitalization altered).

144 *Id.* (capitalization altered).

145 *Id.* at 3.

146 *Id.*

On March 24, Blanding wrote to the grievance program stating that he had not received any response from the superintendent and that he wished to appeal to CORC.[147] On April 16, 2026, Blanding was informed that the grievance had been mailed to CORC that day.[148] There is no evidence that CORC ever responded.

## *III. Preliminary Injunction Hearing*

The Court held a preliminary injunction hearing on June 25. At that time, Blanding's attorneys confirmed that Blanding still was awaiting the fiducial marker placement procedure as well as an urgently needed resection of additional tumors in his bladder.[149] His attorneys represented that Blanding's doctors had recommended on or around June 15 that the resection occur within one week.[150]

Blanding introduced four exhibits at the hearing. Exhibit 1 is a copy of the written report of the cardiologist who spoke with Blanding in the prison infirmary on April 23. The doctor's notes memorialize, among other things, his recommendation that Blanding receive a stress test and be tapered off blood thinners.[151] Exhibit 2 is a copy of a written report by Dr. Fullerton following the unexpected cancellation of Blanding's fiducial marker placement and cystoscopy procedures in

---

147 *Id.* at 4.

148 *Id.* at 7.

149 June 25 Hearing Tr. at 10:20-11:2, 13:24-14:2.

150 *Id.* at 4:6-8, 10:20-11:2.

151 Plaintiff's Exhibit 1.

early May. The report notes that "Patient did not stop [blood thinner] for procedure today."[152] Exhibit 3 is a copy of a March 18, 2026, report by the Mayo Clinic entitled, "Gleason score grading for prostate cancer."[153] Exhibit 4 is DOCCS medical form, signed by an unidentifiable provider, that provides instructions for Blanding to stop taking blood thinners from April 28 until after his cystoscopy.[154]

Defendants introduced no evidence at the hearing. Ahead of it, they submitted a three-page declaration by Danielle Feijóo-Snide, an assistant commissioner within the health services division of DOCCS.[155] Feijóo-Snide disputed whether Blanding had chronic kidney disease (as had been asserted by Dr. Ogur), and claimed, contrary to Blanding's account, that his May procedures had been cancelled because of a gold allergy.[156] These contentions are addressed in detail above.[157]

Other than that, Feijóo-Snide generally did not dispute the facts presented by Blanding. She said that Blanding had been given the stress test recommended by his cardiologist in early June, which of course was roughly one month after he initially was prepped for the surgery

---

152 Plaintiff's Exhibit 2.

153 Plaintiff's Exhibit 3.

154 Plaintiff's Exhibit 4.

155 Feijóo-Snide Decl. (Dkt 16).

156 *Id.* ¶¶ 7, 9.

157 *See supra* notes 77, 93.

before which the stress test should have occurred.[158] She noted that Blanding saw primary and speciality care providers on several dates throughout the first half of 2026, but provided little to no details about what those visits entailed.[159] She said also that a "tentative date" for the rescheduling of the fiducial marker procedure had been identified during the third week of July.[160] Her declaration made no specific mention of the events of June 15 and the apparent urgent need for Blanding to undergo another resection of the bladder.

At the hearing, defendants' counsel said that he could not "defend every thing that has happened" to Blanding. But he argued that "the standard is deliberate indifference," not "perfect treatment or the best treatment or a state-of-the-art treatment that he would desire in the private world."[161] He said that the lawsuit had "gotten DOCCS's attention" and promised that DOCCS would "be more attentive" to Blanding moving forward.[162] Although he maintained that a preliminary injunction was not necessary or legally warranted, he conceded that Blanding's proposed relief was "fairly measured."[163]

On June 30, the Court granted a preliminary injunction by signing a proposed order regarding which the parties had conferred and to which defendants had raised no specific

---

158 Feijóo-Snide Decl. ¶ 6.

159 Feijóo-Snide Decl. ¶¶ 4-6.

160 *Id.* ¶ 8.

161 June 25 Hearing Tr. at 35:6-10.

162 *Id.* at 35:3-4, 38:13-14

163 *Id.* at 38:3-5.

objection.[164] In accordance with the procedures outline in the preliminary injunction, the parties on July 14 submitted an agreed-upon proposed plan of care for Blanding. By order dated July 16, as amended July 20, the Court adopted the proposed plan and directed defendants to comply with it in accordance with the procedures outlined in the preliminary injunction.[165]

## Discussion

To obtain preliminary injunctive relief, Blanding must clear several hurdles. First, under the Prison Litigation Reform Act ("PLRA"), Blanding must demonstrate that he has exhausted his administrative remedies. Next, Blanding must satisfy the preliminary injunction standard applicable to the type of mandatory relief he seeks, including by demonstrating a clear likelihood of success on the merits and a risk of irreparable harm. Finally, under the PLRA, he must demonstrate that the requested injunction is narrowly tailored to redress his injury.

Upon review of the preliminary record compiled by the parties at this early stage in the litigation, the Court concludes that Blanding is entitled to a preliminary injunction for the reasons that follow.

### *I. Exhaustion*

"No action . . . with respect to prison conditions" shall be brought by a prisoner "until such administrative remedies as are available are exhausted."[166] As noted above, Blanding filed at

---

164 Dkt 21.

165 Dkts 25-27.

166 42 U.S.C. § 1997e(a).

least two relevant grievances in recent months. Those complaints asked the prison to remedy ongoing, systemic deficiencies in his medical care that had delayed, and were continuing to delay, his access to potentially life-saving treatment – essentially the same relief that Blanding seeks here. Blanding prosecuted those grievances in accordance with all applicable procedures, including by ultimately appealing each to the highest body authorized to review them, CORC, which was required to respond within 30 days but failed to do so.

Defendants do not appear to dispute that the two grievances described above raised claims sufficiently similar to those alleged in Blanding's complaint to satisfy the exhaustion requirement. Instead, defendants argue that Blanding has not exhausted his administrative remedies because "there is no indication" that CORC "has fully adjudicated" either grievance.[167] On that point, however, defendants overlook controlling law.

The grievances were mailed to CORC on March 16 and April 16, respectively. "[A]n inmate exhausts administrative remedies when he follows the [grievance] procedure in its entirety but the CORC fails to respond within the 30 days it is allocated under the regulations."[168] Accordingly, Blanding's available administrative remedies were exhausted when he filed this complaint on June 12.

## II. *Preliminary Injunction Requirements*

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary

---

167 Mem. of Law in Opp'n (Dkt 17) at 20.

168 *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).

relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."[169] When the government is a party to the suit, "the final two factors merge."[170]

Because Blanding concedes at this stage that he seeks to "alter the status quo by commanding some positive act," he must make a "clear" or "substantial" showing of his likelihood of success on the merits.[171] Still, a party "is not required to prove his case in full at a preliminary-injunction hearing," and "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."[172]

### *A. Likelihood of Success on the Merits*

#### *1. Legal Background*

"It is well established that when the state takes a person into custody, severely limiting his ability to care for himself, and then is deliberately indifferent to his medical needs, the Eighth Amendment's proscription against the unnecessary and wanton infliction of pain is violated."[173] This "deliberate indifference" standard includes objective and subjective components.

---

169 *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

170 *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58 (2d Cir. 2020).

171 *Tom Doherty Asssocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995); *see* Dkt 5 at 4-5.

172 *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (holding hearsay evidence may be considered in deciding whether to grant preliminary injunction).

173 *Charles v. Orange County*, 925 F.3d 73, 85 (2d Cir. 2019).

First, the plaintiff must demonstrate that his or her medical condition objectively is "sufficiently serious."[174] A medical condition is sufficiently serious if it may result in "degeneration or extreme pain" that "significantly affects daily activities" or that involves "chronic and substantial pain."[175]

Second, the plaintiff must show that the defendant acted with a "sufficiently culpable state of mind."[176] This requires showing that a defendant's acts and omissions evince "a conscious disregard of a substantial risk of serious harm."[177] A defendant consciously disregards a substantial risk of harm if the defendant, knowing that the plaintiff faces a substantial risk of harm, "fail[s] to take reasonable measures to abate" that risk.[178] A fact finder "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[179]

---

174 *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

175 *Mallet v. N.Y. St. Dep't of Corr. & Cmty. Supervision*, 126 F.4th 125, 132 (2d Cir. 2025) (first quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998); and then quoting *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003)).

176 *Hathaway*, 37 F.3d at 66.

177 *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021) (quoting *Charles*, 925 F.3d at 87).

178 *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

179 *Id.* at 842; *see Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) ("Evidence that a risk was 'obvious or otherwise must have been known to the defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." (quoting *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003)).

*2. Analysis*

First, Blanding's bladder and prostate cancers obviously constitute objectively serious medical conditions – threatening Blanding with both death and significant pain and discomfort that could affect, and has affected, Blanding's daily life. Defendants do not dispute this.

Second, Blanding has made a clear showing that he likely could prove that multiple prison officials, including some defendants, knowingly disregarded significant risks to his health on numerous occasions in the past – and that such deliberate indifference, attributable to DOCCS itself, was ongoing at the time he filed this complaint.

The prison's treatment of Blanding has been nothing short of disgraceful. Prison officials failed *on two separate occasions* to administer drugs prescribed to treat Blanding's cancer. Prison officials either failed to obtain or simply ignored the results of a biopsy showing that Blanding had prostate cancer *for nearly a year*. And prison officials repeatedly failed to timely schedule follow-up appointments prescribed by Blanding's providers to monitor or treat the progression of his diseases. That is just to mention a few examples. Unlike in many cases involving alleged deliberate indifference to a prisoner's medical needs, moreover, defendants have not offered *any* medical justification for their failure to deliver the cancer care sought by Blanding.

This was not mere negligence. Prison officials knew that Blanding's health was at substantial risk yet still repeatedly disregarded doctors' orders and recommendations or otherwise failed to provide him care. Given the nature of Blanding's conditions, the risks those lapses would pose to his health were obvious. That prison officials acted with sufficiently culpable state of mind is clear also from the years worth of correspondence they received from Blanding and his attorneys. Take Defendant Nayschuler, for example. The record shows that she knew full well what was happening to Blanding. CAL and Blanding's current counsel reached out to her time and time again

to raise concerns about Blanding's care. Yet as far as the record currently shows, she failed meaningfully to respond to those inquires, if she responded at all, all while Blanding continued to wait for the care he urgently needed.

Defendants principally argue that Blanding has failed to prove his entitlement to prospective relief because he has alleged only past violations. But that is not true and overlooks a key point.

It is not true at least because by June 2026 he was still waiting for the radiation treatment prescribed in January and for the new cystoscopy that had not been timely performed. The heel-dragging with respect to the radiation procedure and the cystocopy – ongoing as of June 12 – likely amounted to a knowing failure to take reasonable measures to avoid a substantial risk of harm to Blanding.

And it misses the point because, as Shakespeare wrote, "what's past is prologue."[180] The record in this case reflects repeated and systemic awareness of Blanding's urgent medical needs both at the institutional level and up the chain of command to the highest levels, even to the Commissioner.[181] Yet nothing in the record indicates that prison officials took *any* corrective action to ensure that such lapses would not recur. Thus, Blanding likely will be able to prove that, in the hopefully unique circumstances of his case, the repeated and often knowing failures to address his serious and complex medical needs establish a strong likelihood that new and further episodes are likely to occur absent court intervention. And one need not search far for an illustration.

---

[180] William Shakespeare, *The Tempest* act 2, sc. 1, l. 289.

[181] The extensive record of communications between Blanding's advcoates and prison officials up and down the chain of command, as chronicled above, went far beyond a supervisory official's mere receipt of a grievance "without more." *Thompson v. Pallito*, 949 F. Supp. 2d 558, 575 (D. Vt. 2013).

Just a few days after the filing of the complaint, Blanding noticed blood in his urine and was rushed to the hospital. It there was determined that he again had bladder tumors and that he again required prompt surgical intervention. This emergency room trip might have been avoided if Blanding had been provided a timely cystoscopy to monitor his tumor growth. And that episode was nothing new. Blanding therefore likely could show that the failure of Martuscello and other supervisory officials to take corrective action amounted to a conscious, ongoing disregard of the risk that he would be forced to endure similar unnecessary pain and suffering in the future.[182]

Defendants next argue that Blanding cannot prove that each defendant was personally involved in the alleged deprivation of his rights. But Blanding has sued the defendants in their official capacities for injunctive relief. As such, this action "is *not* a suit against the official[s] personally" – rather, "in all respects other than name," it is a suit against the "entity of which [each] officer is an agent," that is, DOCCS.[183] Blanding need not prove the personal involvement of each

---

182 To be sure, *after* the filing of the complaint, the prison suddenly became at least somewhat more responsive to Blanding's needs. *See* June 25 Hearing Tr. at 38:13-14 ("I'm standing here in open court saying DOCCS is going to be more attentive to him."). But the voluntary cessation of unlawful conduct does not moot a request for prospective relief unless the defendant proves that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *West Virginia v. EPA*, 597 U.S. 697, 720 (2022) (quoting *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007)). Defendants have not even attempted to satisfy that "formidable burden" at this stage. *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)). Moreover, although the prison apparently had scheduled some appointments prior to the issuance of the preliminary injunction, nothing in the record indicated that defendants had remedied the systemic problems that continued to place Blanding at substantial risk of harm.

183 *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. N.Y.C. Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978)).

defendant in an official-capacity suit.[184] For present purposes, it suffices that each defendant indisputably is an executive official with some degree of responsibility for ensuring Blanding receives the medical care to which he is constitutionally entitled.[185]

"[A] governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation; thus, in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law."[186] "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a . . . policy or custom that is actionable under § 1983."[187] On that theory, deliberate indifference "may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,'" but the policymaker 'fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs.'"[188] As explained above, Blanding likely can show that the need for greater supervision of those coordinating his medical care was obvious but that DOCCS

---

184 *See, e.g.*, *Davidson v. Scully*, 148 F. Supp. 2d 249, 254 (S.D.N.Y. 2001) (collecting cases); *see also McKinnon v. Patterson*, 568 F.2d 930, 934 n.4 (2d Cir. 1977).

185 *See, e.g.*, *Koehl v. Dalsheim*, 85 F.3d 86, 89 (2d Cir. 1996).

186 *Graham*, 473 U.S. at 166 (citations omitted) (first quoting *Polk County v. Dodson*, 454 U.S. 312, 326 (1981); and then quoting *Monell*, 436 U.S. at 694); *see id.* at 167 n.14 (contemplating need to consider "state policy or custom" in official-capacity suits); *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007) (holding official-capacity claims against state officials were subject to "*Monell*'s policy or custom requirement").

187 *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (quoting *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.)).

188 *Id.* (alterations in original) (citations omitted) (first quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995); and then quoting *Reynolds*, 506 F.3d at 192).

policymakers consciously ignored the systemic failures that had caused, and likely would continue to cause, violations of Blanding's constitutional rights. On the preliminary record, Blanding has proven the likely liability of DOCCS itself.[189]

### *B. Irreparable Harm and Balance of Equities*

The remaining preliminary injunction factors strongly favor Blanding. The ongoing deprivation of Blanding's constitutional rights suffices to show irreparable harm for purposes of granting preliminary injunctive relief.[190] Even putting that aside, Blanding has proven that he is at imminent risk of serious, irreparable injury to his health.

Defendants argue that Blanding is not likely to be irreparably harmed because the prison has become more attentive to Blanding's case since the filing of this complaint. This argument fails for two reasons.

First, "'[a] defendant's expressed intention to cease the offending conduct is not sufficient to eliminate the possibility of irreparable harm' absent the existence 'of a consent injunction or other enforceable assurance' that the offending conduct will not recur."[191]

---

189 Defendants have not argued that Blanding must show a pattern of conduct affecting inmates beyond Blanding himself, nor has Blanding endeavored to show the same on the accelerated timeline set to address the emergency relief sought at this stage. Discovery on that issue naturally would be appropriate before a final disposition of Blanding's claims should the parties' arguments demonstrate that such a showing is required as a matter of law.

190 *See Arias v. Decker*, 459 F. Supp. 3d 561, 571 (S.D.N.Y. 2020) (collecting cases).

191 *Nat'l Coal. On Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457 (S.D.N.Y 2020) (quoting *Kuklachev v. Gelfman*, 629 F. Supp. 2d 236, 252 (E.D.N.Y. 2008)).

Second, the mere fact that the prison apparently has scheduled some procedures and appointments does not undermine a finding of irreparable harm on this record. Blanding's appointments repeatedly have been missed or cancelled because of the prison's deliberate indifference, and prison officials continually have failed to provide Blanding with necessary follow-up care after his appointments. The record demonstrates, to a virtual certainty, that such troubles will continue in the absence of the requested injunctive relief.

The balance of equities and the public interest decidedly tip in Blanding's favor. On the one hand, if prison officials are allowed to remain deliberately indifferent to his medical needs, Blanding risks dying of cancer (or at the very least enduring additional bouts of severe symptoms). On the other hand, defendants have not argued that the requested relief would unreasonably burden the prison. To the contrary, defendants' counsel conceded that Blanding was "not asking for a lot" and described the requested relief as "fairly measured."[192]

### *III. PLRA Findings*

Under the PLRA, preliminary injunctive relief must "be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."[193] In addition, a court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief."[194]

---

192 June 25 Hearing Tr. at 38:4-5.

193 18 U.S.C. § 3626(a)(2).

194 *Id.*

The PLRA's requirements easily are satisfied here. Rather than order defendants, *ex ante*, to provide a particular course of treatment, or to produce Blanding for appointments at particular dates and times, the preliminary injunction merely requires the prison to develop a plan for Blanding's care in consultation with his doctors and to carry out that plan. The injunction expressly accounts for the prison's security needs and provides ample flexibility with respect to the specific dates and times that procedures will take place. And as already noted above, defendants' counsel raised no concerns that the relief, if granted, would be overly burdensome.

### *Conclusion*

The foregoing constitute the Court's findings of fact and conclusions of law in support of the preliminary injunction entered on June 30, 2026 (Dkt 21) and the Court's order, as amended July 20, requiring defendants to adhere to an agreed-upon plan of care for Blanding in accordance with the procedures outlined in the preliminary injunction (Dkts 26, 27).

SO ORDERED.

Dated: July 22, 2026

Lewis A. Kaplan
United States District Judge